## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**TODD BONDS,**
**PLAINTIFF**

**CASE NO. 1:15-cv-641-TSB-KLL**

**PLAINTIFF'S COMBINED RESPONSE**
**IN OPPOSITION TO ALL**
**THE DEFENDANTS' MOTIONS FOR**
**SUMMARY JUDGMENT**

v.

**UNIVERSITY OF CINCINNATI**
**MEDICAL CENTER et al. ,**

Comes now Pro Se Plaintiff Todd Bonds, submitting to this Honorable

Court, a Response to Defendants Rick St. Blancard and Danny Caudill (formerly

"Two Unidentified Kentucky State Police); and Defendant John William "Jack"

Conway respective Motions for Summary Judgment. A Memorandum in Support

of Plaintiff's Response has been attached hereto.

Respectfully submitted,

Todd Bonds
Plaintiff
2631 Ocosta Drive
Cincinnati, OH 45211
Telephone: 513-969-2445
Electronic Mail: ucmc_conway@yahoo.com
December 19, 2017

## MEMORANDUM IN SUPPORT OF PLAINITFF'S RESPONSE

## STATEMENT OF FACTS

1.      Plaintiff was engaged in protected conduct at all times, hence no arrest for Plaintiff's posts on social media or his emails to the employees of the Kentucky Office of the Attorney General (hereinafter "OAG") .

2.      The dispatch log from the Kentucky State Police (hereinafter "KSP") clearly states that the reason for the visit at the Cincinnati hospital was regarding the social media posts of Plaintiff.

3.       Defendants Rick St. Blancard (hereinafter "St. Blancard") and Danny Caudill (hereinafter "Caudill"); (collectively formerly known as "Two Unidentified Kentucky State Police") visited Plaintiff at the Cincinnati on September 2, 2015 knowing he was in the hospital after being told so by "OAG" supervisor Robyn Bender, after she saw on Plaintiff's helicopter ride from Indiana on Plaintiff's "Instagram" account. During the visit, "St. Blancard" searched Plaintiff's room without a warrant; and "Caudill" continually intimidated and threatened Plaintiff by telling Plaintiff to handle this "or else".

4.      Plaintiff tweeted "It has to be done. There is no other alternative" on September 1, 2015, Plaintiff was referring to his need to stop gambling. However, this benign, vague tweet was used by "OAG" employees and Supervisors Ben Long and Robyn Bender as the reason for "OAG" employees to fear Plaintiff and request that "St. Blancard" and "Caudill" be sent to the Cincinnati hospital to intimidate, harass, interrogate, threaten and illegally search Plaintiff.

5.      On July 1, 2015, Plaintiff had a photo on his Twitter account of a rifle and ammunition. Plaintiff does not remember making such a post. However, under the photo are rap lyrics in quotation marks that do not mention anyone in particular.

6.      On July 14, 13 days after the photo of the rifle on Plaintiff's Twitter account appears, Plaintiff had a cordial, professional and unscheduled meeting with Ben Long at the "OAG". The two met alone in a secluded room, where even Mr. Long said in his email describing the meeting that Plaintiff seemed "grateful". The two had one bone of contention, an open records decision, and ended the meeting amicably.

7.      Plaintiff sent emails threatening to sue Defendant John William "Jack" Conway (hereinafter "Conway") and the "OAG" in February of 2015 and seven (7) months later in September of the same year. Kentucky laws on intimidation, more specifically KRS 524.040 and KRS 524.050 clearly state that once a person has threatened a lawsuit, they become a "witness" and extracurricular activity regarding the "witness" and the lawsuit are punishable by a Class D Felony. Ohio, where the First Amendment Retaliation and Fourth Amendment Rights violations occurred, has similar laws, specifically O.R.C. 2921.04.

## ARGUMENT AND CITATION OF AUTHORITIES

According to the Federal Rules of Civil Practice No. 56, the law requires that Motions for Summary Judgment be viewed in the *"light most favorable to the non-moving party"*. Based on the facts listed above and the reasons listed

below, Summary Judgment cannot be granted to either "St. Blancard"; "Caudill" or "Conway" in this litigation as the literal paper trail of events - deluged with untruths, intimidation of Plaintiff, deceit, knowingly reckless conduct and rights violating behavior by these Defendants – show that Summary Judgment is not appropriate for these Defendants; especially when viewed in light most favorable to the non-moving party (Plaintiff).

## I.   PLAINITFF WAS ENGAGED IN PROTECTED CONDUCT

Plaintiff remained in protected conduct at times in regard to his communications with and about Defendant "Conway" and the "OAG". This is a non-conclusory statement as Plaintiff was never arrested, charged, cited, tried or faced anything criminal in regard to the social media posts, and direct contacts to the "OAG". Plaintiff even requested copies of any warrants in relation to why he was being visited by "St. Blancard" and "Caudill", and the answer was none existed. *(See Exhibit J; RFP No. 1 and Admissions No. 1 and No. 6; submitted with Plaintiff's Motion for Summary Judgment against "St. Blancard" and "Caudill")*

No warrant was ever issued for Plaintiff's arrest, despite the fact that Associate Attorney Generals at the "OAG" and "OAG" security officers tried to obtain one, however no Court or prosecutor was willing to sign such a document beginning as early as March of 201. Six (6) months later, no warrant was ever acquired. *(See Exhibit I submitted with Plaintiff's Motion for Summary Judgment against "St. Blancard" and "Caudill")*

Also, Plaintiff was obviously never considered a threat to the "OAG" members, despite their desperate attempts to make him out to be one by using "dog whistle" terms such as "Plaintiff's tone is escalating". On July 1, 2015, a photo of a black rifle and ammunition was posted on Plaintiff's Twitter account. *(See Exhibit D in "Conway's" Motion for Summary Judgment.)* Under the photo, in quotations, are the words "Look what came in the mail today. Yea it's all black. You can be a white supremacist, but watch how you say all that." The tweet was not sent directly to anyone. As stated from ***Thaddeus X v. Blatter***, ***"circumstantial evidence, such as the timing of events, is appropriate"***. Again, Plaintiff never sent the tweet to anyone. But on July 14, 2015, 13 days after this rifle is appearing on Plaintiff's twitter page – and the "dog whistle" about Plaintiff's escalating tone was circulating in emails in the "OAG" - Plaintiff went to the "OAG" to drop off an Open Records document. Upon noticing who Plaintiff was, the Security Guard made a phone call to someone, and Associate Attorney General Ben Long came out and took Plaintiff into a secluded room and they had a very proactive discussion. Mr. Long even suggested that Plaintiff seemed "grateful" that Plaintiff was able to discuss the issues with someone face to face. At their one bone of contention during the meeting, Mr. Long decided to end the meeting, and the meeting ended amicably. In his email describing the meeting with Plaintiff, "Long" never even mentions the gun post, any threats or any threatening behavior from Plaintiff; despite there being a significant size advantage as Plaintiff is about 2-3 inches taller than Long and was at least 50 pounds heavier. Long was never in danger or threatened by Plaintiff during the

meeting and the record proves the same. *(See the email from Mr. Long to various members of the "OAG" sent July 14, 2015 in Plaintiff's Motion for Summary Judgment against "Conway" Exhibit G)*.

In the case cited by Counsel Jonson, *U.S. v Jeffries*, Mr. Jeffries sent a video to several people saying he would kill a judge and a lawyer over any reductions in his parenting time with his daughter – an obvious threat. The case doesn't even relate as Plaintiff Bonds was never arrested for anything in relation to this litigation.

Also, the "St. Blancard" and "Caudill" were given some type of "Field Information Report" where they continued to try to criminalize Plaintiff at 9 a.m. on September 2, 2015; prior to being dispatched to see Plaintiff at the hospital. *(See "Conway" Motion for Summary Judgment" Exhibit F)*

Federal agencies even told them that Plaintiff Bonds was neither a threat to "homeland security" nor a "terrorism" threat. And through Counsel Jonson, these boxes are explained by "St. Blancard" and/or "Caudill". The boxes leave no ambiguity as to Plaintiff not being a threat to anyone as they say "**FALSE**" and "**NONE**", respectively. *(See Exhibit A submitted with this Response; Plaintiff's Second Interrogatories; RFP and Request for Admissions to "Two Unidentified Kentucky State Police Nos. 1; 4; 8 and 9)*

With no warrants being issued for Plaintiff, and the federal government telling "St. Blancard" and "Caudill" that Plaintiff was not a threat, all Defendants and their superiors – including Mr. Long - had the opportunity to turn away and use other means, such as blocking Plaintiff's email addresses as they are not

required to respond or follow Plaintiff on social media, especially after realizing he was "grateful" for the in person visit. ***"Nothing in the First Amendment or in the [Supreme Court of the United States] case law interpreting it suggests that the right to speak, associate and petition require government policy makers to listen or respond to individuals' communications on public issues"***.

*Minnesota State Board for Community Colleges v. Knight 465 U.S. 271, 285 (1984).*

Plaintiff wasn't entitled to an audience in his efforts; and after agreeing with Long that there was such a disagreement in what was being discussed, the two should amicably end their meeting. The "OAG" had other means at their disposal and could've simply ignored Plaintiff's social media or blocked Plaintiff's email addresses and not *"added to the First Amendment fire." R.A.V. v. City of St. Paul 505, U.S. 377 (1992)*.

Also, as this Court is aware, there has only been one case in which a conviction for words without a direct and clear threat to anyone has been upheld by the Supreme Court of the United States. In *Chaplinsky v. New Hampshire 315 U.S. 568 (1942)* a man was convicted for calling a law enforcement officer a "god d---ed racketeer". However, since "*Chaplinsky*", the Supreme Court has significantly reduced the "fighting words" doctrine to only include profane or vulgar language said "face to face". The only "face to face" meeting between Plaintiff and any "OAG" employee was done on July 14, 2015 with Mr. Long, who exclaimed Plaintiff seemed "grateful" for the meeting.

Since "*Chaplinsky*", there has been a myriad of caseloads in which vulgar language was used at a government official and the conviction was overturned, beginning with **_Terminiello v. Chicago 337 U.S. 1 (1949)_** "*Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment.*"; as well as **_Gooding v. Wilson, 405 U.S. 518 (1972)_**, where a man was assaulting a police officer and said "*White (S.O.B.), I'll kill you.*" "*You (S.O.B.), I'll choke you to death.*" In "*Gooding*", the Supreme Court stated that language that is "*vulgar or offensive…is protected by the First and Fourteenth Amendments.*"; citing **_Cohen v. California 403 U.S 15 (1971)_** from the previous year.

   *Assuming arguendo* that Plaintiff was arrested and charged with a crime in relation to being a threat for his posts or emails, a conviction would not be held up by the Supreme Court of the United States.

   Viewed in a light most favorable to the non-moving party (Plaintiff), with no arrests, warrants, or citations for Plaintiff's contacts with the "OAG" employees, or his social media posts; added with an unscheduled, amicable, face-to-face meeting with "OAG" Associate Attorney General and supervisor Ben Long in which "Long" even described Plaintiff as "grateful" – despite stating that 13 days earlier Plaintiff posted a picture of a rifle on social media – with rap lyrics in quotation marks attached to the picture ; as well as number of Supreme Court cases and precedents that suggest a conviction of Plaintiff for any language

would've never held had it reached the Supreme Court, this Court has no other logical conclusion to reach than to recognize that Plaintiff engaged in protective conduct, despite the weak assertions of Defendants "St. Blancard", "Caudill" and "Conway".

## II. PLAINITFF RECEIVED AN ADVERSE ACTION

Along with the menacing, intimidating and rights-violating visit from "St. Blancard" and "Caudill", Plaintiff's was the victim of a medical setback in his condition. Plaintiff was recovering in the hospital and was being settled down as he had been there for about 18 hours prior to the visit. The last blood pressure reading Plaintiff had was 169/75 – still high but much better than the stroke-like pressure he had upon arrival. Immediately after the visit from the officers, that according to the dispatch log that was obtained from Discovery was clearly motivated by Plaintiff's social media posts, Plaintiff's blood pressure sky rocketed to 200/125. This is a clear injury and regression in Plaintiff's medical condition. (*See Exhibit D of Plaintiff's Motion for Summary Judgment against "St. Blancard and "Caudill"*).

Plaintiff was paralyzed with fear as he felt he was about to be shot in the hospital as "Caudill" kept massaging his service weapon. Plaintiff was also searched by "St. Blancard" who was out of jurisdiction and had no jurisdictional officers present. This is clearly unlawful and "St. Blancard" has admitted he searched Plaintiff's hospital bed in his motion for summary judgment stating that it was a quick look. This is a search by all standards as looking under the sheets was a clear indication that "St. Blancard" needed an "*enhanced view*" to see

whatever he suspected to be evidence. Submitted with *"Exhibit A"* of this Response, under Plaintiff's Second Set of Interrogatories, Defendants "St. Blancard" and "Caudill" stated in Interrogatory No. 3 that they "*spoke to an officer believed to be associated with the Cincinnati Police Department, assigned to (the hospital) prior to visiting Plaintiff on September 2, 2015.*" . *(See Exhibit A of this Response the Interrogatory and Answer for No. 1)*

The record in this case has already proven that this is a lie, as in their emails to their supervisors after the visit they named Todd Ploehs of the Cincinnati Police Department as being present, but they did not include him on their witness list. Plaintiff staying true to his nature, made a pair of Open Records Requests to the Cincinnati Police Department to prove that Officer Todd Ploehs (whom Plaintiff referred to as "Eric" Ploehs by mistake on his witness list submitted to the Court) was not present at the hospital on the day of the visit from "St. Blancard" and "Caudill". Plaintiff found out that Officer Ploehs was a member of the Cincinnati Police Department's Gang Unit during the time of the time period of the visit. Plaintiff asked Cincinnati Police Records Department for any documentation related to any calls Officer Ploehs responded to on September 2, 2015 at a later date, and was presented with the information that clearly shows that Officer Ploehs was not party to any official police work on September 2, 2015 before 3:18 p.m. – the *FALSE* time logged into the dispatch report by "St. Blancard" and "Caudill" as the time the men visited Plaintiff at the hospital on September 2, 2015; which has been proven by the record in this case to be false

by the Admissions and answers to Plaintiff's First Set of Interrogatories by "St. Blancard" and "Caudill". *(See Exhibit B submitted with this Response)*.

Further, any hospital patient who was flown by helicopter to the hospital the night before an intimidating, rights violating interrogation might be a spectacle for a viewer seeing the patient being loaded and unloaded into helicopter – which neither "Conway"; "St. Blancard" nor "Caudill" witnessed – should expect a reasonable amount of privacy based on the seriousness and medical emergency of having to be flown to the hospital alone. A reasonable jury would support this notion.

We've also learned from Discovery, and the record shows, that several employees of the "OAG" purposely involved themselves in Plaintiff's criminal case in Campbell County, adding to the Retaliation. *(See Exhibit I of Plaintiff's Motion for Summary Judgment against "Conway")*. Emails sent by "OAG" members amongst each other clearly show that despite the law in Kentucky clearly stating that "OAG" and Attorney General himself are not to intervene on a case without the Governor's orders or a request from a local Judge, according to KRS 15.240. However, employees of the "OAG" did so anyway, and a reasonable jury would conclude that a preponderance of the evidence suggests that the "OAG" played a part in the local Judge's discretion and sent Plaintiff to prison for a year for a non-violent, low level felony as she called Plaintiff a "danger to the community".

There are too many inconsistencies in the statements of "St. Blancard" and "Caudill" for a reasonable jury to not find that these two men were not out of

control and violated Plaintiff's First Amendment rights; and that "St. Blancard" violated Plaintiff's Fourth Amendment right as he had no jurisdiction in Ohio to search Plaintiff in a hospital room under non exigent circumstances. KRS 164.955 does not grant Kentucky law enforcement officers the ability to go into another jurisdiction within Kentucky, let alone another state under non-exigent circumstances.

There are too many supervisors and employees of the "OAG" involved in this sorry, sordid affair for a reasonable jury to not conclude that Plaintiff was a clear victim of Retaliation from "Conway" and his subordinate supervisors for being involved in clearly protected conduct.

These were no exigent circumstances for these out of state and out of jurisdiction officers - with no local jurisdictional officers present for "St. Blancard" to search Plaintiff's hospital room. In fact, the Supreme Court of the United States have even stated that there must be exigent circumstances to search a person or their property in something even as serious as a murder case; as stated in *Mincey v. Arizona 437 U.S. 385 (1978)* and in *Thompson v. Louisiana 469 U.S 17 (1984)* "...*even if probable cause existed, that is no exception to the warrant requirement.*" quoting "*Thompson*".

There was ample time to get a warrant and a jurisdictional officer present for "St. Blancard" to search Plaintiff. There was no indication that evidence "...*would be lost, destroyed or removed during the time to obtain a search warrant...*", as taken from "*Mincey*". Plaintiff, after being flown by helicopter to the hospital, was expected to be in the hospital for several days.

The adverse actions Plaintiff received were intimidation, a medical set back, an illegal search, and a lawless recommendation for prison in an unrelated issue are clearly far past the "de minimis" level of imposition. These combined actions eventually made Plaintiff not renew his Website out of fear and forfeit on a $20,000 contract that he has been paying back. *(See Affidavit of Damon Flanagan submitted September 25, 2017)*. These actions were an attempt to chill Plaintiff from making posts on social media about Conway and the "OAG"; or contacting them, which is clearly protected conduct.

### III. THE CAUSAL CONNECTION

The Causal Connection between Plaintiffs' protected behavior and the adverse action in this litigation is easy for the Court to discern. The dispatch log from Defendants "St. Blancard" and "Caudill" clearly shows the reason for visiting Plaintiff at the Cincinnati hospital - where they had no jurisdiction - clearly states that they were to talk to Plaintiff about his social media posts concerning the "OAG" and "Conway. *(See Exhibit G of Plaintiff's Motion for Summary Judgment against "Conway")*

It is clear from evidence and the record that the rights violating, intimidating, harassing and menacing visit from "St. Blancard" and "Caudill" was motivated, at least in part by Plaintiff's protected conduct.

### IV. THE BURDEN OF PRODUCTION HAS SHIFTED

Plaintiff has cited the Sixth Circuit Court of Appeals precedent controlling decision *Thaddeus X v. Blatter 175 F.3d 378* many times in his Motion for Summary Judgment. In that case, the Sixth Circuit Court of Appeals stated

*"...once the Plaintiff has shown that the adverse action by the state actors was at least in part motivated by the protected conduct, the burden of production shifts to the Defendants".*

The Defendants in this litigation, according to *Doyle v. Mt. Healthy City School District Board of Education 670 F.2d 59 (6th Cir. 1982)* would have to prove that the adverse action would've occurred in the absence of Plaintiff's protected conduct. In effect, these Defendants would have to show that had Plaintiff not made Constitutionally protected social media posts; "Conway" and his office would have still had enough interest in Plaintiff to alert Kentucky law enforcement to send "St. Blancard' and "Caudill" to intimidate, interrogate, harass and illegally search Plaintiff in an out of state hospital – despite no crimes, arrests, warrants or trials involving the social media posts or direct contacts to "Conway" and the Office of the Attorney General. This is implausible and no reasonable jury would believe this if the Defendants tried to suggest otherwise.

The First Amendment Retaliation statute states that the Defendants are required to show that despite Plaintiff's protected conduct, they would've still visited Plaintiff at an out of state hospital to interrogate him. There is no way a reasonable jury would conclude that these Defendants would've had an interest in Plaintiff if not for the protected conduct. Therefore, these Defendants cannot be granted Summary Judgment.

## IV. PLAINTIFF IS NOT REQUIRED TO STOP THE PROTECTED BEHAVIOR

The actions committed by these Defendants were clearly meant to intimidate and "chill" Plaintiff's protected behavior. The First Amendment Retaliation statute of the United States Supreme Court and the Sixth District Court of Appeals does not require the Plaintiff to "freeze" or completely stop the behavior. Making the Plaintiff's protected behavior completely stop in order to prevail would be a detriment to the First Amendment, especially if the speech is protected or of *"public concern"*. *Snyder v. Phelps, 562 U.S. 443 (2011)*.

Plaintiff was simply *"pointing out the failure of the government to discharge its duties or identifying actual or potential wrongdoing by the government entity…"* as taken from *"Snyder v. Phelps"*.

Also, from *Elrod v. Burns, 427 U.S. 347, 359 N. 13 (1976)* the Supreme Court stated:

> *"Importantly, the deprivation of a valuable government benefit for the purpose of discouraging the exercise of First Amendment rights need not be particularly great in order to find that rights have been violated."*

The government benefit that these Defendants wanted to deprive Plaintiff of was his freedom. The record in this case shows these Defendants did the same by intervening in a non-related issue, despite the Kentucky laws not allowing such behavior under these circumstances.

Additionally, despite the precedent submitted from the Second Circuit by "Conway", the Ninth Circuit, which has the same three elements for a Plaintiff to prevail on a First Amendment retaliation claim as this Sixth circuit - *a. plaintiff is engaged in protected conduct; b. plaintiff received an adverse action that would*

*"chill" a person of ordinary firmness from continuing the protected conduct; c. there is a causal connection between elements "a" and "b"* - has stated in

*Arizona Student's Association v. Arizona Board of Regents 824 F.3d, 858, 867 (9th Circuit 2016)*. :

> *"To prevail on such a claim, a Plaintiff need only show that the Defendant "intended" to interfere with the Plaintiff's First Amendment rights and that Plaintiff's suffered some injury as a result. The Plaintiff is not required to demonstrate that its speech was suppressed or omitted".*

These Defendants tried to stop Plaintiff's protected behavior by trying to discourage the use of Plaintiff's First Amendment rights. *Gooding v. Wilson 405, U.S. 518, 521 (1972)* clearly says that this shouldn't occur:

> *"...persons whose is constitutionally protected well refrain from exercising their rights for fear of criminal sanctions."*

## V. DEFENDANTS ARE NOT ENTITLED TO IMMUNITY

Since the Defendants in this litigation are state actors, they are not entitled to immunity as they are being sued for violations of Federal rights. Plaintiff's First and Fourth Amendment rights are clearly established by the United States Constitution and therefore, these Defendants are not permitted to exercise such immunity. *"Qualified Immunity...protects all but the plainly incompetent or those who knowingly violate the law." Chappell v. City of Cleveland et al, No. 1:2006-cv-02135 (N.D. Ohio 2008).*

All of the Defendants in this litigation knew that Plaintiff's conduct was protected as the record shows they tried to obtain a warrant but was unsuccessful.

"St. Blancard" knew he was out of jurisdiction and no jurisdictional officers were present in the room, and therefore he had no legal right to search Plaintiff's room, much less be present out of state without being in fresh pursuit of Plaintiff.

## CONCLUSION

Based on the clear evidence from the record and precedents that Plaintiff engaged in and remained in protected conduct; the Defendants collectively provided the Plaintiff with adverse actions such as an illegal search; setting back Plaintiff's medical condition with a harassing, and unlawful interrogation; costing Plaintiff to forfeit on a contract for his Web site that he stopped publishing as a result of the visit; threats and intimidation from the hospital visit from "St. Blancard" and Caudill"; and that a reasonable jury would in no way find for this collective of liars and deceitful state actors, this Honorable Court has no other logical conclusion to reach than to *DENY* Summary Judgment for Defendants "St. Blancard", "Caudill" and "Conway".

Respectfully submitted,

Todd Bonds
Plaintiff
2631 Ocosta Drive
Cincinnati, OH 45211
Telephone: 513-969-2445
Electronic Mail: ucmc_conway@yahoo.com
December 19, 2017

## CERTIFICATION

This is to certify that a true and correct copy of the aforementioned Plaintiff's Combined Response to the Motions for Summary Judgment from all Defendants was sent by electronic mail this 19th day of December 2017 to the following:

Kevin Hoskins
**_Attorney for Defendant John William "Jack" Conway_**
c/o Dressman, Benzinger, Lavelle, PSC
221 East Fourth Street
STE 2500
Cincinnati, OH 45202
Telephone: 513-639-7671
Electronic Mail: khoskins@dbllaw.com

**AND**

George Jonson
**_Attorney for Rick St. Blancard and Danny Caudill_**
c/o Montgomery, Rennie and Jonson, LPA
36 East Seventh Street
STE 2100
Cincinnati, OH 45202
Telephone: 513-241-4722
Electronic Mail: gjonson@mrjlaw.com