# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TODD BONDS,
    Plaintiff,

Civil Action No. 1:15-cv-641
Litkovitz, M.J.

vs.

UNIVERSITY OF CINCINNATI
MEDICAL CENTER, et al.,
    Defendants.

**ORDER**

Plaintiff, a former resident of Kentucky who currently resides in Ohio, brings this pro se action alleging violations of his rights by defendants the former Kentucky Attorney General (AG) John William "Jack" Conway and "Two Unknown Kentucky State Police Officers," who plaintiff has identified Richard Saint-Blancard and Danny Caudill ("KSP officers"). The matter is before the Court on the following motions: (1) plaintiff's motion for summary judgment against defendant Conway (Doc. 164), Conway's response in opposition to the motion (Doc. 171), plaintiff's reply in support of the motion (Doc. 177), defendant Conway's notice of supplemental authority (Doc. 180), plaintiff's response (Doc. 181) and defendant's reply (Doc. 183); (2) plaintiff's motion for summary judgment against the KSP officers (Doc. 165), defendants' response in opposition (Doc. 170), and plaintiff's reply in support of the motion (Doc. 176); (3) the KSP officers' motion for summary judgment (Doc. 166), plaintiff's response to the motion (Doc. 169), and defendants' reply in support of the motion (Doc. 178); and (4) defendant Conway's motion for summary judgment (Doc. 167), plaintiff's response in opposition to the motion (Doc. 169), and defendant's reply in support of the motion (Doc. 174).

## I. Backgound

Plaintiff filed the original complaint in this action in October 2015. (Doc. 3). Plaintiff alleged in the original complaint that on or about September 2, 2015, the original defendants violated plaintiff's rights while he was a patient at the University of Cincinnati Medical Center (UCMC) and worsened his "condition," causing plaintiff mental and physical anguish. (*Id.* at 3). On November 18, 2016, the Court granted plaintiff leave to file a pro se amended complaint adding a First Amendment retaliation claim against newly-named defendants the KSP officers and former Kentucky AG Conway (Counts III and V) and adding a Fourth Amendment claim against defendants KSP officers (Count IV). (Doc. 75). Plaintiff alleged in the amended complaint that the KSP officers came onto the grounds of the UCMC "under false pretense" when plaintiff was a patient there, and the unknown UCMC security guard allowed them access to plaintiff's hospital room in "violation of Plaintiff's Protected Health Information." (Doc. 72, ¶ 3; *Id.*, § III, ¶ 10). Plaintiff states he was not in custody and no law enforcement agency was "in immediate pursuit" of him. (*Id.*, ¶ 3). Plaintiff alleges that the KSP officers "intimidated Plaintiff into stopping the publishing of political advice given to black voters on social media and Plaintiff's formerly sole-operated Web site www.theoutclause.com." (*Id.*, § III, ¶ 10). Plaintiff alleges that the KSP officers explained to him that they were sent by the Office of the AG and then-gubernatorial candidate and former Kentucky AG Conway to talk to plaintiff about his social media postings, which routinely criticized the work of the AG, urged voters not to vote for Conway, and "informed black voters of the machinations of 'Conway' and the 'OAG.'" (*Id.*, ¶¶ 3, 4; *Id.*, § III, ¶ 11). Plaintiff alleges his "speech was not a plot to overthrow the government or to break laws." (*Id.*, ¶ 4). Plaintiff alleges that the officers "then threatened Plaintiff with what

seemed like a threat to Plaintiff's livelihood and safety by saying 'handles [sic] this or else . . .' causing Plaintiff to shut down his Web site that was gaining popularity." (*Id.*). Plaintiff also alleges that one of the KSP officers searched under plaintiff's bed covers without asking and without a warrant and found a shoe. (*Id.*, ¶ 3). Plaintiff alleges that he experienced a significant spike in his blood pressure and he requested to go outside. (*Id.*, ¶ 5). Plaintiff alleges that although he had permission to go outside, the guard told him to go back inside. (*Id.*, ¶ 5). The Court denied motions to dismiss filed by defendants KSP officers and Conway and allowed plaintiff to proceed on his First Amendment retaliation claim against these defendants and his Fourth Amendment claim against the KSP officers. (Doc. 115).

## II. Undisputed facts

The following facts are not disputed by the parties, unless otherwise noted.

1. In 2014, plaintiff filed Open Records Act appeals to the Kentucky Office of the Attorney General (OAG) against the Walton-Verona, Kentucky Independent Board of Education ("the Board") and the Spencer County, Kentucky Board of Education: Ky. Op. Att'y Gen. 14-ORD-078; 14-ORD-109; 14-ORD-119; 14-ORD-130; and 14-ORD-153. (Doc. 167, Conway Motion for Summary Judgement, Statement of Fact No. 1).

2. On February 3, 2015, the OAG upheld the denial of plaintiff's sixteenth open records request, which sought 2,000 emails in addition to the approximately 17,000 pages of records plaintiff had previously requested. The OAG found that the facts validated the Board's position that plaintiff's repeated requests were intended to disrupt the essential functions of the Board. (Doc. 167, Exh. A-Ky. Op. Att'y Gen. 15-ORD-015, 2015 WL 602646).

3.  After receiving the decision in 15-ORD-015, Bonds began sending emails to the author of

    the decision, Kentucky Assistant Attorney General Michelle Harrison, and other OAG

    staff members. (Doc. 167, Exh. B).

4.  On February 5, 2015, Bonds sent an email to Harrison and to Conway at

    jack.conway@ky.gov that reads:

    Michelle Harrison may have written the absolute worst opinion known to mankind. I've lost previous Open Records Appeals, but her decision in this case makes absolutely no sense.

    I seriously am beginning to think racism is allowed and in fact favored in the Commonwealth.

    A worker writes racial epithets on an email, and nobody is allowed to see the records that contain other racial epithets?

    So now, based on this ridiculous opinion, I will not be able to see these documents, because I made too many previous requests. So if I waited a year to try to request these documents, the opinion from the OAG is we already opined on this category of records, although the current KRS 61.884 says you should have them.

    Seriously.

    In remembrance of Mike Brown, Eric Garner, Ezell Ford, Tamir Rice and even myself and everybody else who has been victimized by racism.

    (Doc. 167, Exh. B, p. 2).

5.  Benjamin Long, the OAG Civil and Environmental Law Director, was Harrison's

    immediate supervisor. (Doc. 167, Exh. C, Long Aff., ¶ 5). Long forwarded the email to

    Sean Riley of the OAG and Assistant Attorney General Robyn Bender with the comment,

    "forwarding because Mr. Bonds emailed the AG directly." (Doc. 167, Exh. B, p. 2).

6.  Bonds sent an email to Harrison on February 9, 2015 that reads: "Just so that you know

    the little girl in the attached photo is a woman now. She benefited from your ridiculous

    decision." A photo of a lynching was attached to the email. (Doc. 167, Exh. B, pp. 3-5).

7. On February 12, 2015, Bonds sent an email to Harrison and to Conway at the email

   address jack.conway@ky.ag.gov that stated:

   > I'm willing to bet you were paid. Chase Bank was started by slave funds, as was fleet.
   > This little girl benefited from your erroneous decision.
   > . . . .
   >
   > Also, may I have a copy of 14-ORD-109 or whatever the hell he cited in his appeal to
   > you. . . . Racism is alive and well in the capital offices.

   (Doc. 167, Exh. B, p. 6).

8. Bender replied to Bonds' February 12, 2015 email that same day. She informed Bonds

   she was the records custodian and his email was being treated as an open records request.

   She advised Bonds of the proper method for submitting an open records request and of

   how he could find a copy of the decision he requested. (Doc. 167, Exh. B, p. 11).

9. Bonds sent an email to Bender dated February 16, 2015, requesting the name of

   Harrison's supervisor and how to get in touch with that person. Bonds stated, "There is

   reason to believe she was paid for [her] opinion in 15-ORD-15." (Doc. 167, Exh. B, p.

   11). Bender responded that she oversaw all of the civil divisions, including Harrison, and

   Bonds could submit his complaint to Bender. (*Id.*, p. 10).

10. On February 21, 2015, Bonds stated in an email to Harrison and Bender:

    > I was under the impression that I would receive some correspondence regarding
    > my complaint of Ms. Harrison's erroneous decision?
    > . . . .
    > Filing a suit is not in my best interest as I am not an attorney, but I can
    > comprehend reasonable legislation.
    >
    > This is a civil matter, Ms. Harrison allowed a public agency with a known history
    > of civil rights violations against a white female, and whom used a racial epithet
    > against its only black employee in history to deny a claim, by just throwing
    > enough shit against a wall and hoping something sticks.
    > . . . .

    (Doc. 167, Exh. B, p. 10).

11. On March 16, 2015, Bonds stated in an email to Harrison and Bender:

> That stupid ass, ridiculous decision made by Michelle took [sic] allowed Don Ruberg [the attorney who represented the Board in opposing plaintiff's open records requests] to submit to the court a fraudulent of [sic] a document on Friday March 13, 2015.
>
> This is bullshit.
>
> You guys need to be dealt with.
>
> I demand you send me an electronic copy of 15-ORD-015 and The Attorney General's business email address.

Bonds included the following quotes at the bottom of this email and others:

> "We are the camera of print journalism. In order for citizens to see the bigger picture, we have to blow up the negatives."
>
> "You cannot kill your enemy. When you kill a man, his son becomes your new enemy."

(Doc. 167, Exh. B, pp. 14-15).

12. In an email response sent that same date, Bender construed part of Bonds' response as a request for records, she advised him why the request was deficient, she informed him how to submit a proper request and to access the open records decision that he referenced in his email, and she stated:

> [T]he tone and language of your correspondence with this office has been hostile and inappropriate. Our office will not respond to your email messages that are written in such a tone in the future.

(Doc. 167, Exh. B, p. 14).

13. On March 26, 2015, Bonds stated in an email to Harrison and Bender:

> Can I have a copy of Michelle Harrison's resignation when she submits the document? Whom do I address an open records request to for her personnel jacket and file? She is not an attorney of the people. She is totally in the wrong business. The way he hustled her should be clear and convincing evidence for a demotion.

(Doc. 167, Exh. B, p. 16).

14. Bender again sent Bonds an email response construing part of Bonds' response as a request for records, she advised him why the request was deficient, she informed him how to submit a proper request and to access the open records decision that he referenced in his email, and she again informed him:

> [T]he tone and language of your correspondence with this office has been hostile and inappropriate. Our office will not respond to your email messages that are written in such a tone in the future.

(Doc. 167, Exh. B, p. 16).

15. On March 26, 2015, Richard Badaracco, Commissioner, Department of Criminal Investigations, OAG, emailed Bender and informed her that he was keeping a work file with all of Bonds' correspondence. He advised Bender:

> At this point (although very weak) an argument could be made possibly for KRS 525.070 Harassment or perhaps KRS 525.080 Harassing Communications – class B. misdemeanor violation. I'll make some inquiries re: Mr. Bond[s] with OEA. I will also look at his background and if he has a history and/or propensity for any kind of violence.

(Doc. 165, Exh. I).

16. Bonds sent an email to Bender dated March 27, 2015, informing her that he would like to speak to the AG and asking her how he could accomplish this. (Doc. 167, Exh. B, p. 19). Bender sent Bonds an email that same date stating that she would forward the request to the Attorney General's scheduler. (Doc. 167, Exh. B, p. 19).

17. On April 7, 2015, Bonds emailed Bender about his request for meeting with Conway and stated:

> You told me two weeks ago that I would hear from the AG's schedulers, yet I have not heard anything from this person to set a meeting date with the elected official.

You gave me your word this would happen.

I'm not letting Ms. Harrison's erroneous opinion go by lightly, nor am I allowing Mr. Ruberg's blatant lies in order to achieve the desired opinion go by either.

Both Harrison and Ruberg will have material sent to the KY Bar Association. Please don't be the third attorney to go down in the horrific web of lie [sic] that Harrison allowed to percolate.

(Doc. 167, Exh. B, pp. 18-19).

18. In an email response that same date, Bender stated:

I do not appreciate your threats and I ask that you stop making them against me and Ms. Harrison.

She informed Bonds that she had forwarded his request for a meeting with Conway to the AG's scheduler and the request was denied.

(Doc. 167, Exh. B, p. 18).

19. In an email to Bender and Harrison dated April 22, 2015, Bonds stated:

I'm about to mail in an open records appeal.

Can I be assured that the appeal won't touch the other alleged attorney included on this email? The racist lady who doesn't question white men, like a Stepford wife is taught not to do? I mean with opinion 15-ORD-015, she set women's and civil liberties back about 100 years. I hope she is proud.

(Doc. 167, Exh. B, p. 18).

20. According to Long, Harrison's immediate supervisor, the OAG became concerned that Bonds might visit the OAG to harass Harrison or other OAG staff after plaintiff sent a series of emails over several months which "accused Ms. Harrison of racism and used hostile language"; it was decided that Kentucky Capitol security personnel would be given a mugshot of plaintiff; and security was instructed to call Long if Bonds signed in to visit the Capitol. (Doc. 167, Exh. C, Long Affidavit, ¶¶ 5, 6).

21. On July 1, 2015, Bonds posted on Twitter: "Look what came in the mail today. It's all black. You can be a white supremacist, but watch how you say all that." Attached to the post was a photo of a gun. (Doc. 167, Exh. D).

22. On July 14, 2015, Bonds came to OAG main office at the Kentucky Capitol building with an Open Records Act appeal. Long met plaintiff at the front desk and Bonds gave Long the appeal. The two then had a one-on-one meeting in a room in the Capitol building to discuss Bonds' issues with the OAG and the appeal. Long avers that he terminated the conversation after Bonds stated that 15-ORD-015 was "worse than" or "as bad as" the Charleston shooting," which Long understood to be a reference to the June 17, 2005 mass murder of nine people at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina perpetrated by white supremacist Dylann Roof. (Doc. 167, Exh. B, p. 22; Exh. C, Long Aff., ¶ 7).

23. Bonds asserts that the meeting with Long, which was held in a secluded room, was "cordial [and] professional." (Doc. 169 at 3, Plaintiff's Motion for Summary Judgment, Statement of Fact No. 6). Long sent an email to Bender after the meeting describing plaintiff as "grateful," but he questioned whether he should have met with plaintiff alone "since he is unstable." Long explained that he was "trying to head off more crazy emails." (Doc. 167, Exh. B, p. 22).

24. After the meeting and on the same day, plaintiff sent an email to Bender, Long and Harrison which states:

As for the visit with Mr. Long, I entered the visit and left the visit very concerned. . . . [T]he guard knew my name and summoned Mr. Long. . . .

That is foul. You people sent out an APB for me? This further shows you all are blocking for Michelle Harrison's fuckery known as 15-ORD-015.

This is not "The Day of the Jackal." As I have stated before I am not "Don't tread on my lawn guy." I am your typical, garden-variety inner city urchin, as described by many people in public offices in this state.

. . . .

Also during the meeting with Mr. Long, he referred to Ms. Harrison several times as "Shelly." Is Ms. Harrison a 15-year-old-girl? No wonder she won't question white men. Why are we referring to grown women as "Shelly" in a professional, public agency?. . . .

. . . .

During the meeting, it was clear that Mr. Long's role was to block for "shelly" and Robyn Bender.

Since I was ambushed by security and Mr. Long, and in addition to the fact that I am in possession of an email conversation between myself and the attorney who spoke on behalf of the agency in Ms. Harrison's fuckery known as 15-ORD-015, you all have left me with no choice but to file suit against Ms. Harrison, Robyn Bender, Mr. Long as individuals and the OAG as an agency for a myriad of charges including dereliction of duty in a public office; discrimination, and slander. Had Ms. Harrison asked one simple follow-up question before she set out to opine on the fuckery known as 15-ORD-015, all of this could have been avoided. . . .

I WANT TO SPEAK WITH THE GOD DAMNED ATTORNEY GENERAL.

. . . .

But I am filing suit.

P.S. The only other Benjamin I know is a key figure in the Boone County Circuit Court case 14-CI-1854; Todd Bonds vs. Walton-Verona Independent Board of Education. He was a racist employee who started this mess. The same Walton-Verona who I have made the most appeals regarding Open records/Open Meeting violations. The same Walton-Verona which benefitted when Ms. Harrison produced the fuckery known as 15-ORD-015. Oh, the irony Benjamin.

(Doc. 167, Exh. B, pp. 23-24).

25. On July 26, 2015, plaintiff sent an email to Bender, Long, Harrison, Assistant Attorney

General Amye Bensenhaver and Ruberg regarding a letter he had received from

Bensenhaver which indicated that information related to the Board's denial of his Open

Records Request had been sent to Ruberg. The email reads in part:

There was nothing in the passage that said the citizen had to inform the agency of any responses to the reply, yet Ms. Bensenhaver sent my responses to Don Ruberg, a man who tried to have me killed while dropping papers off at his office.

The Crestview Hills PD came to his law firm with their chest full of the hot air that is White Supremacy. . . .

The reason I say killed because when black folk are accosted by law enforcement, the outcome usually isn't positive for the black person. This has been occurring for 400 years in this country. . . .

Please explain this to me as you all know, I am your garden variety inner city urchin.

(Doc. 167, Exh. B, p. 27).

26. In an email response she sent plaintiff the next day, Bender wrote she understood that

Bonds had spoken with Bensenhaver about the issue raised in his email and that

Bensenhaver had provided Bonds with the information he had requested. Bender also

objected to at least one "hostile" and inappropriate voicemail Bonds had left on Long's

voicemail. (Doc. 167, Exh. B, p. 27). Bonds replied in an email:

Your reply is a blatant example of white supremacy working full steam ahead. What you essentially said is "be a good, colored boy and maybe, just maybe I'll let one of the AAGs speak to you."
. . . .
What if Benjamin Long or John William "Jack" Conway told you, "Go work for the National Organization for Women. Bitches should work with bitches." Would you be civil about the same? That is what this public agency in this state said to me, except they substituted "nigger" for "bitch." I would say pardon my language, but the ship containing a diplomatic language sailed. It's time to get down to business.

You are extremely unprofessional and not trustworthy.

I left Benjamin Long a voice mail earlier today. It was the third I have [sic] for him in several days. . . .

Remember, your organization ambushed me while I was dropping off the Open record Appeal that is now in question. But I already [sic] the wheels of white supremacy working to unsubstantiated [sic] my appeal. You guys made up laws as you go. . . .

You are not living up to you end on the bargain as an employee of a public agency. Shame on you all for putting Amye Bensenhaver in the line of fine that you started.

"Jack" Conway isn't living up to his campaign promises. I could have sworn that I saw him in commercials with all the people around him, frolicking and skinning and grinning. The man on the TV said that since "Jack" has a blue "D" accompanying his name, he actually gives a damn.
I've seen nothing to support the same notion.

I WANT A MEETING WITH THE GOD DAMNED ATTORNEY GENERAL. If I were contacting your office because Ahmed from Sierra Leone told me that he has $300 million in a trust but needs to borrow $20 million to reach the money, in which he would give me $50 million of his trust, your organization would be all over the issue. But when public agencies use hostile language in a public forum, the OAG is silent. Why does the OAG protect idiots who would send Ahmed such money, but doesn't go after public agencies that mistreat employees? Please answer me that, Ms. Bender.

I would ask that if you are not willing to work with the public, then resign. This is part of the job. Dealing with black people is a part of your job. But you refuse to do the same.

If I have to pitch a tent on the lawn of the capitol, I will. I'm gonna be heard. God forbid, but I don't think I'd be mad if a cop kills me while on the lawn of the capitol. Then the fuckery know [sic] 15-ORD-015, all these emails and the notes I have about the treatment from you will get substantial play in the media.

In the event I am killed by law enforcement because an elected official refuses to meet with the public he serves; and YOU, Benjamin and "Shelly" are all blocking for a white supremacist public agency, all I ask is that you just send my family a wreath and let my kids know that I died so that they wouldn't have to face the same bigotry I faced.

In the mean time, get me some face with Jack. OK? Right now, all I need is about 30 minutes. But the time increases with each day YOU, Benjamin and "Shelly" continue to block for white supremacists.

(Doc. 167, Exh. B, pp. 25-27).

27. Bonds also wrote in an email reply to Bender and Long on July 27:

Benjamin,

More evidence that you are an asshole, and out of touch with reality.

The card you gave [sic] has the email address Benjamin.long@ky.ag.gov

Anytime I send an email to that address it comes back.

Employees of a public agency blocking written communication from the public is censorship.

But you knew that. You are a white man. You know every god damned thing.

Read below and get me some face time with "Jack."

(Doc. 167, Exh. B, p. 25).

28. On July 27, 2015, Bonds sent an email with a photo attached to Bender and others that reads:

These are Spencer County High School students at a high school hoops game. Look at the student in black face.

This is the type of shit your office is protecting.

. . . .

Please get me some fact [sic] time with "Jack."

(Doc. 167, Exh. B, pp. 29-30).

29. On July 27, 2015, OAG employees exchanged a series of emails. Bender sent an email message to Richard Badaracco and copied Long on the email. Bender stated that she had forwarded an email message to Badaracco that Bonds had left for Leigh Morris of the OAG. She stated that Bonds had also left a hostile voicemail for Long, which she asked Long to forward to Badaracco. Bender stated she had forwarded Bonds' hostile emails to Badaracco in the past and that the situation seemed to "be escalating." (Doc. 167, Exh. B, p. 35). Bender forwarded the email to Mitchel Denham a few minutes later since Badaracco was out of the office, advising Denham:

Todd Bonds is calling our office repeatedly and leaving hostile, offensive voicemails. He has previously sent hostile, offensive emails. I don't know what, if anything can be done.

(Doc. 164, Exh. A, p. 2).

13

30. Moments later, Denham sent an email to Bender and copied George Wilding of the OAG, Badaracco, and Long on the email. He asked that all of them forward the messages to Wilding as well. (Doc. 164, Exh. A, p. 2). Long responded that he had forwarded his messages, and later that afternoon Morris sent Bender, Long, and Jan Velez of the OAG plaintiff's Twitter handle. (*Id.*).

31. Later that afternoon, Bender sent an email to Wilding, Badaracco, Denham, Long and Sean Riley that read:

FYI - Todd Bonds is now on twitter saying:

- "Fuck Kentucky Attorney general Jack Conway and one of his Assistant AGs Michelle Harrison."
- "The KY Attorney Generals office thinks I am The Jackal. These Fucksticks ambushed me about a week ago."
- The cover up at the KY Attorney Generals Office. Robyn Bender, Michelle Harrison, Ben Long and AG Jack Conway himself are involved.
- Call 502-696-5300 and let Jack Conway and them Stepford wives he got working for him know that #BlackLivesMatter

(Doc. 164, Exh. A, p. 3).

32. In a July 29, 2015 email, Bonds stated to Bender and Long:

Ms. Bendah, I's wuz wondering is I cud get a meat up wid da head boss man.

I's jus wanna talks to him abouts some thangs as a citizen of the commwealth.

I's is a citizen now. We's no longer 3/5ths of a man.

(Doc. 167, Exh. B, p. 37).

33. On August 12, 2015, Bonds stated in an email to Bender and others that:

Since Political Pimp John William "Jack" Conway cannot be reached because of the underlings blocking for him; and Benjamin Long gave me a business card with an invalid email address and also ambushed me at the gates about a month ago, Michelle Harrison's blocking for white supremacy and your subsequent blocking, I have filed a complaint against you, Long and Conway with the United States Attorney General.

After that I will pursue other legal remedies, such as a civil suit for failure to provide a service while in office, I for the KRS code, but you, Long and John William "Jack" Conway are violators of the statute, from where I sit.

I want some face time with the Attorney General, and Michelle Harrison needs to resign immediately and pursue her hobbies of knitting and baking cookies for white men full time.

(Doc. 167, Exh. B, p. 38).

34. On August 26, 2015, Bonds posted on Twitter, "#VesterFlanagan story and motive. All I can say is I get it. #WDBJ". Bonds also posted a tweet that read, "I will gladly answer for #VesterFlanagan. Send all media to me #WDBJ".[1] (Doc. 167, Exh. D, pp. 3-4; *See* Doc. 167, Exh. C, Long Aff., ¶ 10).

35. Chad Carroll of the KSP was head of Kentucky Capitol Security during this time. In late August Carroll visited Long's office, indicated he had been "made aware of Bonds," and asked Long about Bonds' interaction with the OAG. Long informed Carroll of the OAG's history with Bonds and described Bonds' social media posts that were concerning to the OAG in light of Bonds' email communications with OAG staff. These posts included "a photo of a gun that Bonds implied he was in possession of" and "tweets noting that Bonds understood why Vester Flanagan killed two individuals on August 26, 2015, in Roanoke, Virginia during a live television interview." Carroll left his contact information, stated that the KSP were looking into any potential threats posted by Bonds, and requested that Long keep Carroll updated on any developments and forward any communications from Bonds to Carroll. (Doc. 167, Exh. C, Long Aff., ¶ 10).

36. On August 28, 2015, the OAG issued 15-ORD-162, which found that the Board had violated the Kentucky Open Records Act by not responding to Bonds' open records

---

[1] Vester Flanagan shot and killed two employees of a television station during an on air interview in 2015. (Doc. 167, Exh. C, ¶ 10).

request within three days but the Board had not violated the Act by withholding information concerning the ethnic and racial makeup of the employees supervised by Kim Lake. Ky. Op. Att'y Gen. 15-ORD-162, 2015 WL 5157541.

37. On August 31, 2015, Bonds wrote in an email to several OAG employees:

> . . . Nothing will make me forget Michelle Harrison's bullshit from 15-ORD-015. She took a bribe. This is street court. You need to prove yourself, Harrison.

> Ben Long, Mr. Herrick informed me that you are playing left tackle for the Attorney General's football team, and has been assigned to block me.
> . . . .
> I am still convinced that the OAG has decided to protect white supremacist [sic] at all costs. If not, how does Benjamin Long and Michelle Harrison still draw a check from this organization?

> Essentially what has happened with 15-ORD-162 is you allowed Shelby County to steal $7 from me. A Negro male from another state once stole from me. Once. His new street handle is "Hamburger Helper". . . .
> . . . .

> And again, when it comes to Kim Lake, . . . the OAG is protective of the white supremacist.

> Oh yeah, fuck you Michelle Harrison and Robyn Bender. Please do the citizens of the Commonwealth a favor and eat shit and die. You too Benjamin for giving out fake email addresses. You call a grown woman in a professional setting, Shelly? And fuck John William "Jack" Conway too.
> . . . .

> Did any of you guys see "Straight Outta Compton"? It's been the No. 1 movie for three weeks in a row, about a rap group from the late 1980s-mid '990s called "NWA". Three of you on this email think I am a member of the group. NWA stands for "Niggas With Attitudes".

> "Looking back on school, arts and crafts. I hated half the staff. I beat up half my class. I was like Dr. Dre though I have to laugh. Nigga with a attitude. Meet me after math." – Cam'Ron (I love that song. That is great wordplay by the rap artists who performed the lyrics).

> Let's pick a date to discuss Benjamin.

(Doc. 167, Exh. B, pp. 39-40). Long forwarded the email to Carroll and informed Carroll that "the communications we are receiving from Mr. Bonds are escalating." (*Id.*, p. 39).

38. Carroll came to Long's office a second time on or about August 31 or September 1, 2015, and informed Long that Bonds had a lengthy criminal history, he "fits the profile of an active shooter," and the KSP would be making contact with Bonds within the next couple of days to assess his intentions towards the OAG. Carroll recommended that the OAG take the following security precautions related to Bonds, which the OAG adopted: no one from the OAG should have any contact with Bonds, Harrison's parking spot should be moved closer to the Capitol building, and increased security should be made available to the OAG. (Doc. 167, Exh. C, Long Aff., ¶ 11).

39. On September 1, 2015, Bonds posted on Twitter at 3:00 p.m.: "It has to be done. There is no other alternative." (Doc. 167, Exh. D, p. 5). Long forwarded the post to Bender, stating: "I'm not trying to take Mr. Bonds out of context, but no context was provided." (Doc. 167, Exh. B, p. 42). Bender in turn notified Carroll of the post, stating that she knew Carroll had said he was "monitoring Bonds' social media," and Carroll wrote in an email that he would attempt to make contact with Bonds that night and would have "extra presence" around the OAG's office the next day. (Doc. 167, Exh. C, Long Aff., ¶ 12; Doc. 164, Exh. F; Doc. 177, Exh. C, p. 9).

40. Bender subsequently alerted Long that Bonds had posted a tweet with a link to an Instagram picture of himself on a gurney wearing an oxygen mask and a video of the gurney being wheeled to a helicopter. (Doc. 177, Exh. C, p. 9).

41. Bender emailed Long and Harrison later that evening and informed them that Carroll had called to tell her that Bonds was at UCMC and that the KSP would follow up tomorrow

"to get an update." (Doc. 167, Exh. B, p. 43). To Long's knowledge, no one at the OAG requested that Carroll follow up with Bonds. (Doc. 167, Exh. C, Long Aff., ¶ 13).

42. The following day, KSP officers Caudill and Saint-Blancard visited plaintiff in a semi-private hospital room that he shared with one other patient at the UCMC. According to Bonds, Caudill "massaged" the service revolver that was in its holster or had his hand near the revolver the entire time the officers were in the room. (Doc. 161, Bonds Depo., pp. 145, 147; Doc. 167, Exh. E). Saint-Blancard lifted up the cover at the foot of plaintiff's bed and put the cover back down after observing a shoe there. (*Id.*, p. 152). The officers told plaintiff, "We want to make sure you do this the right way" and then added something that sounded like "or else" as they were turning to leave, but the words were only "moderately audible." (*Id.*, pp. 151-52).

43. According to Richard Saint-Blancard, he and Caudill visited Bonds because of Bonds' history of communications with the OAG and its employees, which included multiple emails, phone calls, and comments on social media posts concerning Conway, the OAG, and the State Capitol. (Doc. 167, Exh. 1, Saint-Blancard Aff., ¶ 3). They conducted an investigatory visit for the purpose of hearing Bonds' side of the story and evaluating whether he posed a threat to the safety and well-being of Conway and other citizens of Kentucky. (*Id.*, ¶¶ 2, 6). Saint-Blancard states that when they conducted the interview, hospital staff members were nearby and a Cincinnati police officer was in or near the room. (*Id.*, ¶ 7). Saint-Blancard asserts that Bonds was "never instructed or asked to shut down his website or stop posting on social media" and that he and Caudill "never threated Mr. Bonds either through our words or our actions." (Doc. 166, Saint-Blancard Aff., Exh. 1).

44. Caudill described the meeting with Bonds in an email dated September 2, 2015:

> Regarding the Todd Bonds complaint from yesterday evening. We were able to locate Mr. Bonds at the University of Cincinnati Emergency Room last night. Lt. St.-Blancard and I followed up by contacting Mr. Bonds at the hospital earlier today. We were accompanied by a Cincinnati Police Officer who was assigned to the hospital. Mr. Bonds said his intentions are to follow the proper, legal channels to address his concerns. He did, however, point out he intends to continue to use social media to blast KAG Jack Conway. My opinion is Mr. Bonds is an intelligent, educated man. Based on his responses, I expect Mr. Bonds to attempt to spin this meeting. He used the word "ambushed," to describe this meeting. We reiterated several times during the meeting our intentions were only to have a proactive meeting with him to clarify his intentions regarding the KAG office.

(Doc. 167, Exh. B, pp. 46-47).

45. According to a hospital record plaintiff has submitted, his blood pressures were recorded as follows: 196/108 upon his arrival at the hospital; 194/109 at 7:46 a.m. on September 2, 2015, the day of the officers' visit; 169/97 at 11:09 a.m.; 200/125 at 12:22 p.m.; and 178/76 at 2:37 p.m., which is the latest reading on the record. (Doc. 165, Exh. D). Plaintiff attributes an increase in his blood pressure to the officers visit.[2] (Doc. 169 at 9, citing Doc. 165, Exh. D).

46. The KSP Field Information Report reads in part as follows:

> . . . .
>
> Apparently unsatisfied with the Attorney Generals office, Mr. Bonds has sent numerous Emails and left multiple voicemails to the Attorney Generals Office that are of concern. Mr. Bonds makes reference to wishing that certain employees of the Attorney Generals Office die. Additionally, Mr. Bonds states he has severely injured persons in the past that have crossed him.
>
> Kentucky State Police intelligence located multiple social media accounts of Mr. Bonds. On these accounts, Mr. Bonds has posted photographs of firearms while offering justification and sympathy for the suspect in a recent shooting in Virginia where a female news reporter and cameraman were murdered while they were broadcasting live on television.

---

[2] Plaintiff alleges that "the last blood pressure reading [he] had" (presumably before the officers' visit) was 169/75 and that it increased to 200/125 immediately after the officers' visit. (Doc. 169 at 9, citing Doc. 165, Exh. D). Exhibit D does not include a reading of 169/75.

Mr. Bonds also talks of police involved shootings of unarmed persons, specifically "Mike Brown/Darren Wilson" and "Sam Dubose/Ray Tensing." He states he is aware of the "centralized location" of where "State Troopers" can be found."

On September 2, 2015, Kentucky State Police made contact with Mr. Bonds. After this contact, Mr. Bonds posted on his social media accounts his distaste for law enforcement.

Please use caution if you come into contact with Mr. Todd Bonds as his recent behavior and negative view toward government and law enforcement are of concern.

(Doc. 167, Exh. F, p. 2).

47. In a September 4, 2015 email, Bonds wrote:

Fuck each and every last one of you. You sent goons to see me in the hospital. That was Funny.

Now you've got a federal lawsuit coming.

Again, fuck you and every thing you stand for. Fuck Jack Conway. I'm voting for Bevin.

(Doc. 161, Exh. 31).

48. On September 9, 2015, Bonds emailed the OAG with a link to his website, www.theoutclause.com. (Doc. 161, Exh. 37).

49. On September 12, 2015, Bonds wrote in an email to the OAG:

Please respond to the email address tbonds776@yahoo.com as my Web site will be undergoing its annual maintenance and over haul. I'm not sure when dude is going to get started tho. LOL.

No phone calls as you all do me.

But due to your recent behavior, my plan is to file this Monday, 9/14/15 at 2 p.m. unless we can reach an agreement prior to then.

But I have had my fill with the white supremacists elected to that office and employed by that office. The visit from the KSP was the last straw.

As previously mentioned by Robyn Bender, I do not have an email address for Jack Conway. Emails from her prove that although he is a public employee, his email is not made available to the public. . . .

(Doc. 167, Exh. B, p. 44).

50. Bonds testified at his deposition that he did not renew the website because he did not want to continue with it, but he notified the OAG that the website would be undergoing its annual maintenance because he "wanted Jack Conway and his underlings to think that I was still giving them the--you know, the butt whipping on the Internet about their machinations."

(Bonds Depo., 211:12-18; Doc. 167, Exh. E).

51. On September 14, 2015, Bonds wrote in an email to Long, Bender, Bensenhaver, Harrison and James Herrick of the OAG:

I've been perusing the ORDS from the various deputy AGA and I notice a trend. . . . 3 out of 4 decisions Shelly is involved in, that motherfucker sides with the agency. It's in writing on the site. She is a supporter of white supremacy.

I'll assume we can't reach an agreement. I'm headed to the courthouse.

(Doc. 167, Exh. B, p. 54).

52. On September 17, 2015, Long sent an email with the following question to Badaracco and Wilding and copied Bender: "Any update on how Mr. Bonds' court appearance earlier this week went or what the outcome was?" (Doc. 164, Exh. I, p. 1). That night, Badaracco forwarded Long an email Badaracco had received from Kevin Calhoon of the OAG which read: "Spoke to comm attorney he plead guilty to original charge and has agreed to sentence of 2 years diversion which [sic] be imposed on November 9, 2015." (Doc. 164, Exh. I, p. 2).

53. On November 6, 2016, Bonds posted on Twitter: "Had state police crossed state lines n come see me in a hospital basically over emails." He also posted: "Shit got real while I was suffering from a cardiac event. Fuck boy politico had no chill. Over some emails and him not going (sic) his job." (Doc. 167, Exh. D, p. 10).

54. According to Conway, he was not aware of any criticisms or comments Bonds made about him; he never viewed any of Bonds' social media postings or websites; he did not personally request that the KSP visit Bonds, and he had no personal knowledge prior to this lawsuit of the events leading to the KSP officers' visit to Bonds' hospital room at the UCMC. Conway asserts that he relied on "his staff and security" to handle and evaluate threats to him, his family and the OAG. (Doc. 167, Exh. G, Conway Affidavit, ¶¶ 2-5, 7).

55. Conway did not use or monitor any email address that had jack.conway@ky.gov or jack.conway as part of the address. (Doc. 167, Exh. G, Conway Aff., ¶ 6).

56. On November 19, 2015, pursuant to a plea agreement, plaintiff was placed on felony diversion and released on probation after pleading guilty to theft by failure to make a required disposition of property valued at $500. (*See* Doc. 172, Exh. 1 - *Bonds v. Commonwealth of Kentucky*, No. 2016-CA-000007-MR, 2017 WL 5624639 (Ky. App. Nov. 22, 2017)). After finding that plaintiff had violated the terms of his probation, the Campbell County Circuit Court revoked plaintiff's pretrial diversion and sentenced him to one year in prison. (*See id.*). The Kentucky Court of Appeals affirmed the Campbell County Circuit Court's decision on November 22, 2017. (*Id.*). The Court of Appeals found that the trial court did not err in finding that Bonds had violated the terms of his diversion "when he used cocaine, falsified a release report, failed to report a change in

home address, and provided false information to [a] parole officer," and by revoking his diversion based on findings that that Bonds was a significant risk to, and could not be managed in, the community. *Id.*, 2017 WL 5624639, at *2-3.

## III. Summary judgment standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but it is to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249; *Little Caesar Enterprises, Inc.*, 219 F.3d at 551. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted

by [the evidence] remain entitled to an interpretation most favorable to the non-moving party."
*Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011).

Because plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that the Court holds pleadings of pro se litigants to less stringent standards than formal pleadings drafted by lawyers)); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) (pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings). However, a party's status as a pro se litigant does not alter his duty to support his factual assertions with admissible evidence. *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F. Supp.2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)). When opposing a motion for summary judgment, a pro se party cannot rely on allegations or denials in unsworn filings. *Id.* (citing *Viergutz*, 375 F. App'x at 485).

## IV. Qualified immunity

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Once a defendant raises a qualified immunity defense, the plaintiff has the burden to show: (1) "a violation of a constitutional right" and (2) that "the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011). To find a violation of clearly established law, "in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, - - U.S. - -, 137 S.Ct. 548, 552 (2017) (quoting *Anderson*, 483 U.S. at 640). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting Anderson, 483 U.S. at 640). The Court

must "identify a case where an [official] acting under similar circumstances as [defendants] was held to have violated the [constitutional right.]" *White,* 137 S.Ct. at 552. For qualified immunity to apply, "the right's contours [must have been] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* -- U.S.--, 134 S.Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640 (internal citations omitted). The crucial question is "whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff,* 134 S.Ct. at 2023. In determining whether a constitutional right is clearly established, the Court looks first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within the Sixth Circuit, and then to decisions of other circuits. *Benison v. Ross,* 765 F.3d 649, 664-65 (6th Cir. 2014) (citing *Bell v. Johnson,* 308 F.3d 594, 601-02 (6th Cir. 2002); *Plumhoff,* 134 S.Ct. at 2023) ("[E]xisting precedent must have placed the statutory or constitutional question confronted by the official beyond debate.") (internal quotation marks omitted)).

## VI. Plaintiff's First Amendment claims

### 1. First Amendment retaliation claim under § 1983

Plaintiff brings his First Amendment claim against defendants under 42 U.S.C. § 1983. To pursue a claim under § 1983, plaintiff must show (1) that he was deprived of a right secured by the Constitution or laws of the United States, (2) by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). To establish a First Amendment retaliation claim, plaintiff must demonstrate three elements: (1) he engaged in constitutionally protected speech;

(2) "he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech"; and (3) "the protected speech was a substantial or motivating factor in the decision to take the adverse action." *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). Once a plaintiff raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts and defendant "can demonstrate that it would have taken the same action in the absence of the protected activity." *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002) (citing *Thaddeus–X*, 175 F.3d at 399).

### i. *Constitutionally protected speech*

Whether speech is "protected" under the First Amendment is a "context-specific" inquiry. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007) (citing *Thaddeus-X,* 175 F.3d at 388). Ordinarily, state actors cannot prohibit an individual from disseminating "social, economic and political doctrine which a vast majority of [] citizens believes to be false and fraught with evil consequence.'" *U.S. v. Hankins*, 195 F. App'x 295, 300 (6th Cir. 2006) (citing *Virginia v. Black,* 538 U.S. 343, 358 (2003) (*citing Whitney v. California,* 274 U.S. 357, 374 (1927) (Brandeis, J., concurring) (*overruled on other gds.*)). "It is well-settled that the freedom to criticize public officials and expose their wrongdoing is a fundamental First Amendment value, indeed, "'[c]riticism of the government is at the very center of the constitutionally protected area of free discussion.'" *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966)). "Speech is not unprotected simply because its message it offensive to its recipients." *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 821-22 (citing *Hill v. Colorado,* 530 U.S. 703, 714-15 (2000) (protected speech may be "provocative and challenging" or may "strike at prejudices and preconceptions and have

profound unsettling effects")). Speech that may be considered "vulgar or offensive" may be protected under the First Amendment. *United States v. Landham,* 251 F.3d 1072, 1080-81 (6th Cir. 2001) (citing *Sable Communications v. FCC*, 492 U.S. 115 (1989); *Cohen v. California,* 403 U.S. 15 (1971)). *See also Cole v. Barnes*, 128 F. Supp.3d 1002, 1017-18 (M.D. Tenn. 2015). "[V]erbal criticism and challenges directed at police officers" is often protected. *Cole,* 128 F. Supp.3d at 1017 (citing *Greene v. Barber,* 310 F.3d 889, 896 (6th Cir. 2002) (quoting *City of Houston, Tex. v. Hill,* 482 U.S. 451, 461 (1987)).

There are, however, certain limited categories of speech that are "of such slight social value" that the First Amendment permits restrictions to be imposed on them. *Black*, 538 U.S. at 359 (citing *R.A.V. v. City of St. Paul, MN,* 505 U.S. 377, 382-83 (1992) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72 (1942)). These include "fighting words," which are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* (citing *Cohen,* 403 U.S. at 20; *Chaplinsky,* 315 U.S.at 572). *See also Kinkus v. Village of Yorkville,* 453 F. Supp.2d 1009, 1014-15 (S.D. Ohio 2006) ("fighting words" is a narrow exception to First Amendment protected speech, and even though an individual may use profane speech to a police officer, the content of the speech is protected) (citing *Chaplinsky,* 315 U.S. at 572; *R.A.V.,* 505 U.S. at 386). A state may also proscribe advocacy of the use of force or a violation of the law "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Black,* 538 U.S. at 359 (citing *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969)).

The state may also proscribe a "true threat" without violating the First Amendment. *Id.* (citing, e.g., *Watts v. United States,* 394 U.S. 705, 708 (1969) (a statute which makes a form of

"pure speech" criminal "must be interpreted with the commands of the First Amendment clearly in mind" and requires that a distinction be drawn between a "a threat" and "constitutionally protected speech"); *R.A.V.*, 505 U.S. at 388 ("threats of violence are outside the First Amendment")). A true threat is a statement that "an objective, rational observer would tend to interpret, in its factual context, as a credible threat." *Hankins*, 195 F. App'x at 300-01 (quoting *United States v. Alkhabaz*, 104 F.3d 1492, 1505 (6th Cir. 1997)). *See also Black*, 538 U.S. at 359 (*citing Watts*, 394 U.S. 705; *R.A.V.*, 505 U.S. at 388) (holding that true threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals")). The Supreme Court explained in *Black* that the speaker need not actually intend to carry out the threat:

> Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Black*, 538 U.S. 343, 359-60 (2003) (internal citations omitted). A statement is a "'true threat' when it amounts to 'a serious expression of an intention to inflict bodily harm' and is 'conveyed for the purpose of furthering some goal through the use of intimidation.'" *U.S. v. Houston*, 683 F. App'x 434, 438 (6th Cir. 2017), *cert. denied*, 138 S.Ct. 286 (2017) (quoting *Alkhabaz*, 104 F.3d at 1495). "A statement need not be communicated to the targeted individual in order to constitute a 'true threat.'" *Id.* (citing *Alkhabaz*, 104 F.3d at 1495).

A statement's context must be considered in determining whether it is a true threat. Threatening statements directed at specific individuals may be entitled to protection depending on the context in which the statements are spoken. *Cole*, 128 F. Supp.3d at 1018 (citing *Watts*, 394 U.S. at 706-08). In *Hankins*, the Court held that statements the plaintiff made about two

public officials were "true threats" that were not protected by the First Amendment. *Hankins*, 195 F. App'x at 300-301. The Court found statements that the plaintiff wanted one official "crippled. . . . So, he can tell, so people can see" and "hospitalized from the god damned . . . bullet wound," coupled with an offer to pay a murderer $20,000 to perform the shooting, could "reasonably be interpreted as a serious expression of intent to harm" the official. *Id.* at 301 (citing *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985) (holding that "[a] threat to break a person's knees or pulverize his automobile as punishment for his having given information to the government is a statement of intention rather than an idea or opinion and is not part of the marketplace of ideas.")). The Court also found the plaintiff's statements that he "could go up yonder and kill [Sheriff] Wallace Whittaker tomorrow. Kill him. Right in his fucking office" could be interpreted as a statement of intent to seriously harm the sheriff since there was no political context to the violent statements, the plaintiff made them to a friend in the privacy of his home, and he made the statements only a few months after his arrest for growing marijuana. *Id.* (distinguishing *Watts*, 394 U.S. at 705, 708, where a protestor's statement "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." made to a large audience during a Washington D.C. anti-war rally was held to be "political hyperbole" that did not satisfy elements of criminal statute prohibiting a person from "knowingly and willfully . . . (making) any threat to take the life of or to inflict bodily harm upon the President. . . .").

### ii. *Adverse action*

The Sixth Circuit has explained that for First Amendment purposes, "any action that would deter a person of ordinary firmness from exercising protected conduct will [constitute a sufficient adverse action]." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583-84 (6th Cir. 2012). The threat of an adverse action can satisfy the second element of a First Amendment retaliation

claim "if the threat is *capable* of deterring a person of ordinary firmness from engaging in the protected conduct." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citing *Bell*, 308 F.3d at 606) (emphasis in the original). *See also Stolle v. Kent State U.*, 610 F. App'x 476, 483 (6th Cir. 2015) (citing *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 822). Actual deterrence need not be shown. *Hill*, 630 F.3d at 472 (citing *Harbin-Bey v. Rutter*, 420 F.3d at 579 (6th Cir. 2005)). *See also Stolle*, 610 F. App'x at 483 (citing *Ctr. for Bio–Ethical Reform, Inc.*, 477 F.3d at 822).

Whether an alleged adverse action is sufficient to deter a person of ordinary firmness from engaging in protected speech is generally a question of fact. *Wurzelbacher*, 675 F.3d at 583-84 (citing *Bell*, 308 F.3d at 603). The inquiry is "context-specific." *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 821 (citing *Thaddeus-X*, 175 F.3d at 388). However, if the alleged adverse action is "inconsequential," resulting in nothing more than a "de minimis injury" ("very small or trifling"[3]), the claim is properly dismissed as a matter of law. *Wurzelbacher*, 675 F.3d at 584 (citing *Bell*, 308 F.3d at 603, 606). "A chilling effect sufficient under this prong is not born of *de minimis* threats or 'inconsequential actions. . . .'" *Ctr. for Bio-Ethical Reform*, 477 F.3d at 822 (citing *Thaddeus*, 175 F.3d at 397). Indeed, it "trivialize[s] the First Amendment to allow plaintiffs to bring . . . claims for *any* adverse action[,] no matter how minor." *Wurzelbacher*, 675 F.3d at 584 (quoting *Bell*, 308 F.3d at 603) (internal quotation marks and citation omitted) (emphasis in original)).

The adverse action element is "not an overly difficult one for the plaintiff to meet" and "is intended to weed out only inconsequential actions." *Hill*, 630 F.3d at 472-73 (citing *Thaddeus-X*, 175 F.3d at 398). Further, because "there is no justification for harassing people for

---

[3] *Morgan v. Dir., OWCP*, 210 F.3d 372 (table), 2000 WL 331952, at *7 (6th Cir. Mar. 30, 2000) (quoting Black's Law Dictionary 431 (6th ed. 1990)).

exercising their constitutional rights," the deterrent effect of the adverse action need not "be great" in order to be actionable. *Id*. at 473 (citing *Thaddeus-X*, 175 F.3d at 397) (citation and internal quotation marks omitted). "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury." *Bell*, 308 F.3d at 606. *See also Hill*, 630 F.3d at 473. The types of action that have been held sufficient to satisfy the adverse action element include a threat to an individual's economic livelihood (*Fritz v. Charter Twp.*, 592 F.3d 718, 724, 728 (6th Cir. 2010)); defamation (*Id*. at 726); a search or seizure of property (*Bell*, 308 F.3d at 604-05); and "the public disclosure of intimate or embarrassing information" (*Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998)). *Wurzelbacher*, 675 F.3d at 584. A two and one-half hour detention and search of the plaintiffs' personal property and vehicles without probable cause conducted in a public view has also been held sufficient to satisfy the adverse action element. *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 822.

### iii. *Causal connection*

If the first two elements of a First Amendment retaliation claim are satisfied, then a determination must be made as to whether the adverse state action was "motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *See Bloch*, 156 F.3d at 678 (citations omitted). To determine whether the causal connection element is satisfied, the Court undertakes a two-prong inquiry. First, the Court determines whether "the adverse action was proximately caused by an individual defendant's acts"; second, the Court considers whether "the individual taking those acts was motivated . . . by a desire to punish [the plaintiff] for the exercise of a constitutional right." *Paterek v. Village of Armada, Michigan*, 801 F.3d 630, 646 (6th Cir. 2015) (quoting *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012)). "The true object

of this inquiry is to determine whether the plaintiff has been retaliated against as a direct result of his or her protected speech." *Id.*

## 2. The parties' arguments

### i. *First Amendment retaliation claim against defendant Conway*

Plaintiff moves for summary judgment on his First Amendment retaliation claim against defendant Conway on the grounds Conway used the power of his office to retaliate against plaintiff to stop him from publishing his website, www.theoutclause.com. (Doc. 164 at 2). Plaintiff alleges that after receiving an erroneous Open Records Act decision from Harrison, plaintiff informed citizens of the "blatant racism, discrimination and bigotry" present in many Kentucky agencies and emailed Conway in his official capacity as the Kentucky Attorney General. Plaintiff alleges that in response, Conway ordered an employee "to keep a watchful eye" on plaintiff as though Conway believed plaintiff's "whistleblowing, threats of litigation, requests to meet [Conway]," and dissemination of information to citizens were "criminal" acts when in fact they were not. (*Id.* at 3). Plaintiff argues that the three elements of a First Amendment retaliation claim are satisfied.[4]

First, plaintiff alleges that his acts of emailing individuals and posting on social media are protected conduct under the First Amendment. Plaintiff asserts he was never arrested, indicted or cited for his communications (Doc. 169 at 4, citing Exh. J, KSP Officers' Answers to Interrogatories, Nos. 1, 6; Doc. 165, Exh. I); he never engaged in "face-to-face vulgarity"; and there is no indication that anyone felt threatened by plaintiff's speech. (Doc. 177 at 10-12). Plaintiff argues this case is distinguishable on its facts from *United States v. Jeffries,* 692 F.3d 473, 480 (6th Cir. 2012), *abrogated in part by Elonis v. United States,* - - U.S. - -, 135 S.Ct. 2001

---

[4] Plaintiff's arguments are set forth in his summary judgment motion and reply memorandum and in his response to defendants' motions for summary judgment. (Docs. 164, 169, 177).

(2015), a Sixth Circuit decision defendants rely on, because *Jeffries* involved a direct and obvious threat to kill a lawyer and a judge. (Doc. 169 at 6). Plaintiff asserts that in contrast to *Jeffries*, he never sent the tweet that apparently precipitated his unscheduled meeting with Long - a photo of a black rifle and rap lyrics - to anyone and Long gave no indication that he felt threatened by plaintiff during their one-on-one meeting at the Capitol. (*Id.* at 5-6, citing Doc. 164, Exh. G, Long July 14, 2015 email summarizing the meeting). Further, plaintiff alleges federal agencies determined he was not a threat to homeland security or a terrorism threat. (*Id.* at 6, citing Exh. A, KSP Officers' Answers to Interrogatories, Nos. 1, 4, 8, 9). Plaintiff claims that the OAG had the option to block his emails and ignore his social media posts, and he alleges they instead "added to the First Amendment fire." (*Id.* at 7, citing *R.A.V.*, 505 U.S. 377). Plaintiff alleges that Caudill and Saint-Blancard visited him at the hospital in response to an innocuous tweet that referred to plaintiff's need to stop gambling - "It has to be done. There is no other alternative" - which was aimed at no one and which Long admitted had no context. (Doc. 164 at 7, citing Exh. C ). Plaintiff argues defendants cannot justify their actions under the narrow "fighting words" doctrine, which does not apply here because the doctrine is limited to face-to-face encounters and does not proscribe vulgar, offensive language. (Doc. 169 at 7-8, citing cases).

Second, plaintiff alleges that defendant Conway took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in the protected activity. Specifically, plaintiff alleges that defendant Conway and OAG employee Long, while acting within the scope of his employment, requested that the KSP travel to the UCMC to talk to plaintiff about a crime he never committed and to search plaintiff's hospital room while he was recovering from a near-fatal spike in blood pressure. (Doc. 164 at 6-7). Plaintiff alleges that

Conway and OAG supervisors Long and Bender tried to use the unconstitutional "heckler's veto" by sending the KSP to see him at the hospital. (Doc. 177 at 12, citing *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 253 (6th Cir. 2015)).[5] Plaintiff alleges the KSP visit was an adverse action because he was subjected to an illegal search, the encounter caused him to suffer a medical setback - a significant spike in his blood pressure - and he was intimidated to the point that he took down his website. (Doc. 164 at 6-10; Doc. 177 at 13).

Plaintiff alleges that the third element of his First Amendment retaliation claim is satisfied because there is a causal connection between his protected conduct and the KSP officers' visit to his hospital room. Plaintiff contends the causal connection is evidenced by the KSP dispatch log, which documents that plaintiff's posts on social media and on his website about Conway and the OAG were the reasons the KSP officers were dispatched to his hospital room. (Doc. 164 at 9-10, citing Exh. H). Plaintiff alleges that Conway continued to retaliate against him after the KSP officer's visit by intervening in an unrelated and low level state court felony charge against plaintiff, leading the judge to tell plaintiff he was a "danger to the community" and to send him to prison in Kentucky, which delayed this litigation. (Doc. 164 at 9-11, citing Exh. I; Doc. 177 at 13).

Plaintiff alleges Conway is liable for the adverse actions taken against plaintiff under the doctrine of *respondeat superior*. (Doc. 164 at 11-13). Plaintiff relies on a blanket rule and Ohio law to argue that an employer is vicariously liable for an employee's wrongful acts as long as the employee committed the acts within the scope of his employment. (*Id*. at 11). Plaintiff alleges

---

[5] The Sixth Circuit explained the meaning of this term as follows: "If the speaker's message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it. Simply stated, the First Amendment does not permit a heckler's veto." *Bible Believers*, 805 F.3d at 252 (citation omitted).

that Conway is liable for Long's actions because Long was acting within the scope of his employment and Conway must have known of the actions taken against plaintiff. (*Id*. at 12-13). Plaintiff challenges the credibility of Conway's assertions that he never saw an email from plaintiff prior to this litigation. Plaintiff alleges that no reasonable jury would believe that the KSP's intervention in the situation between plaintiff and the OAG, and the KSP officers' hospital visit, would have occurred without Conway's knowledge. (*Id*. at 12). Finally, plaintiff argues he was damaged because he "was in a contract that would've paid him $20,000 over the next five years." (*Id*. at 14, citing Doc. 159 at 5, Affidavit of Damon Flanagan, dated Sept. 18, 2017).

Defendant Conway has filed a motion for summary judgment on plaintiff's First Amendment claim against him (Doc. 167), a reply in support of his motion (Doc. 174), and a response in opposition to plaintiff's motion for summary judgment (Doc. 171). Conway alleges that plaintiff's evidence does not suffice to meet the second and third elements of a First Amendment retaliation claim because plaintiff has not produced evidence that (1) Conway, the OAG or the KSP took an adverse action against him, and (2) the motive for the KSP visit was anything other than plaintiff's harassing and "disturbing behavior." (Doc. 167; Doc. 171 at 2-3).

First, Conway argues that the evidence plaintiff relies on does not show that the OAG took an adverse action against plaintiff. (Doc. 167 at 16). This evidence consists of an email that Long sent to Assistant Attorney General Bender, which Bender in turn forwarded to Carroll of the KSP, regarding a tweet by Bonds which Long found to be concerning. (Doc. 171 at 2-3). Conway alleges that the OAG's decision to forward the tweet was reasonable given Bonds' history of harassing the OAG, his demands to personally see Conway, his social media posts

about the use of guns against white supremacists, and the KSP's warning to the OAG about "Bonds' criminal and violent history." (*Id.* at 3).

Conway also argues there is no evidence that the KSP took an adverse action against plaintiff. Conway alleges there were legitimate reasons that the KSP officers visited plaintiff at the hospital, the hospital visit constituted *de minimis* conduct, and the officers did not make a threat or take other action that would deter an individual of ordinary firmness from exercising his rights. (Doc. 167 at 17; Doc. 171 at 3, citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). Conway further alleges that plaintiff cannot establish that Conway himself took an adverse action against plaintiff. Conway contends that the only proof plaintiff has offered to show that Conway was part of a scheme to retaliate against plaintiff for publishing his website www.theoutclause.com consists of (1) an email that plaintiff sent to the email address jack.conway@ky.gov, which is not an address used by Conway; and (2) emails that other Kentucky state government employees sent inquiring about Bonds' sentence in the state court criminal case and documenting Bonds' own harassment of OAG employees. Conway argues plaintiff has not produced evidence to show that Conway viewed any of plaintiff's social media posts. Conway also contends there is no evidence to show that he or any other individual at the OAG asked that action be taken against Bonds or that they had the authority to order the KSP to take action against Bonds. (Doc. 164 at 17; Doc. 171 at 2-3).

Further, Conway argues that plaintiff's evidence does not suffice to establish a causal connection between plaintiff's political criticisms of Conway and an adverse action by Conway. (Doc. 164 at 17-20; Doc. 171 at 4-6). Conway notes that plaintiff attempts to show a causal connection through (1) the KSP dispatch log, which documents the reason for the officers' hospital visit, and (2) the OAG's alleged intervention in plaintiff's state court criminal

proceeding, as purportedly evidenced by the OAG's request for updates on the proceeding. Conway argues that the dispatch log is not evidence of a causal connection between plaintiff's protected activity and any adverse action by Conway. Conway does not dispute that the KSP were dispatched to speak with plaintiff because of his postings on social media regarding the OAG and the Capitol. (Doc. 171 at 4-5, citing Doc. 164, Exh. H). However, Conway alleges that the evidence shows that Bonds first criticized Conway on his website on September 9, 2015 one week after the hospital visit, so there is no plausible connection between protected activity by plaintiff and an adverse action by Conway. (Doc. 171 at 5, citing Exh. A). Conway argues that the evidence instead shows that the reason for the KSP officers' visit was plaintiff's escalating harassment of the OAG, his history of criminal and violent behavior, and his "ominous" social media posts about using guns against white supremacists. (*Id*. at 5-6). Further, Conway alleges that internal communications seeking updates on plaintiff's unrelated state criminal proceeding do not constitute "intervention" in the proceeding and are not evidence of a causal connection between plaintiff's protected activity and an adverse action by Conway. (*Id*. at 5). In addition Conway argues plaintiff cannot establish a causal connection because there was no change in his behavior following the KSP officers' investigatory visit, and plaintiff therefore cannot show that his First Amendment rights were "actually chilled." (*Id*. at 6, citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).

Finally, Conway argues that he cannot be held liable under the theory of *respondeat superior* because the doctrine does not apply to a claim brought under § 1983. (Doc. 171 at 7-8, citing *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 589 (6th Cir. 2008)).

Plaintiff contends that Conway has conceded that plaintiff's emails and social media/website posts were protected conduct by failing to address the communications in his

summary judgment motion. (Doc. 177 at 10). Plaintiff alleges the final tweet of September 1, 2015 before the KSP officers' hospital visit was a benign tweet as he was mulling to himself about the need to stop gambling, and the evidence shows Long and Bender perceived the tweet to be innocuous.[6] (*Id*. at 16; *see* Exh. C). Plaintiff disputes Conway's assertion that the adverse action must have "actually chilled" plaintiff's exercise of his protected rights to establish a First Amendment claim. (*Id*. at 14-15). Plaintiff argues that under Sixth Circuit law, it is only necessary that the adverse action would "chill a person of ordinary firmness" from engaging in the protected conduct.[7] (*Id*. at 15-16, citing *Crawford-El v. Britton*, 523 U.S. 574 (1996); *Thaddeus-X*, 175 F.3d 378).

Plaintiff alleges the KSP officers' visit was an adverse action that caused him to suffer a medical setback - a significant blood pressure spike - and to eventually stop publishing his website. (Doc. 177 at 13). Plaintiff concedes that he sent a few emails to the OAG in early September 2015 "scoffing at the retaliatory behavior at the hospital," and he wrote a final story on his website on September 9, 2015 to inform citizens that he allegedly might be killed as a result of defendants' actions. (*Id*. at 14). However, plaintiff contends he did not renew his website in late September 2015 due to fear. (*Id*.). Plaintiff alleges that because he has produced evidence that meets his initial burden of showing he was engaged in protected conduct and Conway took an adverse action against him, Conway must establish that he would have taken the

---

[6] This tweet read: "It must be done. There is no other alternative."

[7] *Curley*, the Second Circuit case defendants rely on for the argument that the adverse action must have "actually chilled" the exercise of plaintiff's First Amendment rights to establish the third element of a retaliation claim, does not apply here. *Curley* sets forth a three-part First Amendment retaliation test that differs from the test used in the Sixth Circuit and expressly incorporates the "actually chilled" requirement as the third element. *Curley*, 268 F.3d at 73. The Sixth Circuit puts the burden on plaintiff to show in connection with the "adverse action" element "that he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech." *See Westmoreland*, 662 F.3d at 718. The plaintiff does not have the burden to show the exercise of his rights was "actually chilled."

same adverse action had plaintiff not engaged in the protected conduct. (*Id*. at 17). Finally, plaintiff argues that Conway is liable under the Ohio state law doctrine of *respondeat superior.*

### ii. *Plaintiff's First Amendment claims against the KSP officers*

Plaintiff has filed a motion for summary judgment on his First Amendment claim against the KSP officers (Doc. 165), a reply in support of his motion (Doc. 176), and a response in opposition to the KSP officers' motion for summary judgment (Doc. 169). Plaintiff argues that the speech that led to the KSP officers' visit was protected speech. Plaintiff contends his speech did not pose a "clear and present danger" to anyone (*Schenk v. United States*, 249 U.S. 47 (1919) and it did not direct or was not likely to incite imminent lawless action (*Brandenburg v. Ohio*, 395 U.S. 444 (1969). (Doc. 165 at 6-7). Plaintiff alleges he had criticized Conway and other OAG personnel prior to the visit. (*Id*. at 5-6, citing Exh. F). Plaintiff notes that although the tweets mentioned the OAG and some OAG employees, he did not send the tweets to anyone in particular and the tweets do not suggest any lawless activity. (*Id*.). Plaintiff alleges his tweet stating, "It has to be done. There is no other alternative," was a benign tweet that was not aimed at anyone and referred to his need to stop gambling. (*Id*. at 5).

In addition, plaintiff alleges the KSP officers took an adverse action that deterred him - a person of ordinary firmness - from publishing his website and posting on social media by "interrogating" him and searching his room while he was "incapacitated." (*Id*. at 7-9). Plaintiff asserts a UCMC employee knocked on the door of his room, introduced the officers, and Caudill then closed the door behind them. (*Id*. at 9). Plaintiff alleges the officers advised him they "were there for 'Conway'" and to talk to plaintiff about his "social media posts regarding 'Conway' and the 'OAG.'" (*Id*. at 8). Plaintiff contends the officers intimidated him and impliedly threatened that he would be punished if he did not stop publishing negative

information on the internet and social media regarding Conway and the OAG. Plaintiff alleges the officers did so by warning plaintiff to "make sure you handle this, or else." (*Id.* at 8). Plaintiff asserts he assumed he was under arrest or about to be killed because Caudill continued to "massage" his service revolver throughout the visit. (*Id.*). He alleges the officers caused him to have a medical setback because his blood pressure "skyrocketed" as a result of the officers' visit. (Doc. 169 at 9, citing Doc. 165, Exh. D).

The KSP officers argue the undisputed facts do not support plaintiff's First Amendment claims. (Doc. 170). They have filed a reply in support of their summary judgment motion (Doc. 178) and a response in opposition to plaintiff's motion (Doc. 170). Defendants argue that plaintiff's speech, which included threatening and harassing communications with the OAG, a tweet with a photo of a rifle, and another tweet stating "It has to be done," is not entitled to protection when considered in conjunction with plaintiff's criminal history and advice from the head of Kentucky Capitol Security that plaintiff "fits the profile of an active shooter." (Doc. 166 at 8-9; Doc. 170 at 5-6, citing *Jeffries*, 692 F.3d at 475-77). Defendants allege that Bonds' tweet of a firearm with the comment, "You can be a white supremacist, but watch how you say all that," coupled with additional emails and tweets accusing the OAG of racism, are sufficient "for a reasonable listener of the speech to feel threatened." (Doc. 166 at 8-9). Defendants allege that evidence showing the OAG moved Harrison's parking spot closer to the Capitol building, increased security available at the OAG office, and ceased contact with Bonds shows that individuals at the OAG perceived plaintiff's speech to be threatening. (*Id.* at 9). Defendants argue that the "new" evidence plaintiff has introduced in support of his motion for summary judgment does not entitle him to summary judgment on his First Amendment claim. (Doc. 170 at 4, citing Doc. 165, Exhs. A-F). They allege that plaintiff has not introduced evidence to show

that his last tweet before his hospitalization - "It has to be done. There is no other alternative"- was innocuous when considered in the context of earlier tweets, including the tweet with the photo of a rifle. (Doc. 170 at 6). They contend that plaintiff's speech constitutes threats, which are not protected under the First Amendment. (*Id.*, citing *Jeffries*, 692 F.3d at 475-77).

The KSP officers also argue that plaintiff was not subjected to an adverse action. They contend that while plaintiff alleges in the complaint that their hospital visit caused him to take down his website, the evidence shows that he continued to post to his website, shared the link with the OAG, and represented it was being overhauled. (Doc. 166 at 10, citing Doc. 161, Plaintiff's Deposition, pp. 208-11). Further, they assert that plaintiff continued to make public statements critical of the OAG and Kentucky law enforcement after the hospital visit. (*Id.*, citing Doc. 161, Exh. 31- September 4, 2015 email to Long, Bender and Harrison with the subject line, "Fuck you white supremacists").

Defendants acknowledge that plaintiff's communications with the OAG and his comments on social media concerning Conway, the OAG and the State Capitol led to the investigatory visit at the hospital. (Doc. 166; Exh. 1, Saint-Blancard Aff., ¶ 3). However, they deny that plaintiff was ever told to shut down his website or stop posting on social media. (*Id.*; Exh. 1, Saint-Blancard Aff., ¶ 8). They argue that perceived threats of danger prompted the hospital visit, not threats of litigation against Conway and the OAG as plaintiff alleges. (Doc. 170 at 4; *See* Doc. 165, Exh. A).[8] They rely on Long's affidavit to show that plaintiff's threatening and harassing communications with the OAG, his criminal history, and advice from the head of Kentucky Capitol Security that plaintiff "fits the profile of an active shooter" were the events that together led to the hospital investigatory visit. (Doc. 170 at 5, citing Doc. 132-2,

---

[8] Exhibit A is a February 5, 2015 email from plaintiff to Harrison and jack.conway@ky.gov criticizing the Open Records Appeal decision written by Harrison. Plaintiff cites the exhibit to show he threatened to file a lawsuit against Conway and the OAG in February 2015. (Doc. 165 at 4).

Long Aff.). Defendants argue that plaintiff made real threats which are not protected speech and that the cases plaintiff cites to show otherwise are distinguishable. (Doc. 170 at 7, citing *Schenk*, 249 U.S. 47, which held that attempts to obstruct the draft during World War I were not protected by the First Amendment against a violation of the Espionage Act, and *Brandenburg*, 395 U.S. at 444, in which the Court found an Ohio criminal statute to be unconstitutional because it criminalized advocating for the use of violence as opposed to inciting imminent lawless action).

Defendants argue that because plaintiff did not engage in constitutionally protected speech or suffer an adverse action that caused him actual injury, they are entitled to qualified immunity on plaintiff's First Amendment retaliation claim. (Doc. 166 at 16-18). Defendants acknowledge that the First Amendment protects against retaliatory conduct but they allege plaintiff has not established he was subjected to retaliatory action. (*Id*. at 16-17, citing *Williams v. Ohio DOC*, 2010 U.S. Dist. LEXIS 37643, at *3 (S.D. Ohio 2010)). Defendants also allege that the contours of the right to be free from an investigatory visit while a patient at a hospital are not clearly defined. Thus, they contend the evidence does not support a finding that they violated plaintiff's clearly established constitutional rights.

### iii. Defendants are entitled to summary judgment on plaintiff's First Amendment claims

To succeed on his First Amendment claims, plaintiff must demonstrate that his correspondence with the OAG and his online communications were protected speech under the First Amendment; defendants took an adverse action against him; and there is a causal connection between plaintiff's protected speech and the adverse action. Plaintiff has not come forward with evidence to carry his burden on summary judgment against any defendant.

### a. First Amendment claim against defendant Conway

Plaintiff has not introduced any evidence to show that: (1) defendant Conway took an adverse action against him, and (2) assuming, *arguendo*, that plaintiff could establish the first two elements of First Amendment retaliation claim, that there was a causal connection between plaintiff's protected speech and any adverse action.

Plaintiff alleges that Conway took two adverse actions against him: (1) Conway worked with Long of the OAG to request that the KSP travel to the UCMC to talk to plaintiff about a crime he never committed and to search plaintiff's hospital room while he was recovering from a near-fatal spike in blood pressure (Doc. 164 at 6-9); and (2) Conway intervened in plaintiff's unrelated state court criminal proceeding. (*Id.* at 10-11, citing Exh. I). Conway has submitted evidence to show that he had no involvement in either alleged adverse action. Conway has submitted his affidavit in which he asserts that he was unaware of any criticisms of him or other comments Bonds made about him prior to this litigation. (Doc. 167, Exh. G, Conway Aff., ¶ 4). Conway also states that he never viewed any of Bonds' social media postings or websites prior to this litigation. (*Id.*, ¶ 5). Conway explains that he relied "on my staff and security to evaluate threats to the safety and security" of him, his family and the OAG. (*Id.*, ¶ 2). Conway states that evaluation of social media and other communications by Bonds was handled by the OAG staff and/or the KSP without his personal knowledge. (*Id.*, ¶ 4). Conway also states that he has no personal knowledge of events leading to the KSP's visit to Bonds at the UCMC aside from what he has learned during the course of this litigation. (*Id.*, ¶ 5). Finally, Conway avers that he never used or monitored a "jack.conway@ky.gov" email address or any email with "jack.conway" as part of the address. (*Id.*, ¶ 6).

Plaintiff has not introduced any evidence that creates a genuine issue of fact as to whether Conway in fact had knowledge of plaintiff's online postings and email communication prior to this litigation. Nor has plaintiff introduced evidence that creates a genuine issue as to whether Conway played any role in the KSP officers' hospital visit with plaintiff. Plaintiff simply speculates that Conway must have known about plaintiff's email communications. To support this allegation, plaintiff points to one internal email Long forwarded to Riley and Bender of the OAG stating that Long was forwarding an email Bonds had sent to Harrision and Conway at jack.conway@ky.gov because Bonds "had emailed [Conway] directly." (Doc. 164 at 11, citing Exh. D). However, Conway's affidavit refutes plaintiff's allegation that Conway received that particular email, and plaintiff has produced no evidence that creates an issue of fact as to Conway's affidavit. Plaintiff has not proffered evidence other than this single email to show that Conway was aware of his online postings and communications and that Conway took an adverse action against plaintiff in response to plaintiff's criticisms of Conway and OAG employees. Plaintiff's speculation that the jury would disbelieve Conway's representations is insufficient to support a finding in plaintiff's favor on his First Amendment retaliation claim against defendant Conway. *See Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 371 (6th Cir. 2013) (citing *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586 (making clear that the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing [a motion for summary judgment] may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion.") (internal quotation marks omitted)).

Plaintiff also has not introduced any evidence to show that Conway retaliated against him by intervening in his state court criminal proceeding. Plaintiff simply speculates that some individuals in the OAG intervened in the proceeding based on (1) correspondence showing OAG employees inquired into the status of the proceeding, and (2) the state court judge's decision to exercise her sentencing discretion to impose a prison sentence. (Doc. 164 at 10-11, citing Exh. I). Plaintiff has introduced evidence to show the OAG sought an update on the status of the proceeding from the "comm attorney"; however, this evidence provides no indication that the OAG intervened in any manner in the actual proceeding. (Doc. 164, Exh. I). Plaintiff's speculation is insufficient to support a finding that Conway had any knowledge of plaintiff's criminal proceeding and to show that Conway intervened in the proceeding. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586.

Even assuming that Conway knew of plaintiff's postings, plaintiff cannot hold Conway liable for actions taken by taken by other individuals in the OAG based on the theory of *respondeat superior*. Supervisory liability cannot be imposed in a § 1983 action based on the theory of *respondeat superior* unless there is evidence of the defendant's personal involvement in the alleged misconduct. *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80-81 (6th Cir. 1995)). Thus, to hold Conway liable for First Amendment retaliation, plaintiff must establish that Conway "either encouraged the specific incident or misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that [Conway] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Everson v. Leis,* 556 F.3d 484, 495 (6th Cir. 2009) (quoting *Hays v. Jefferson Cnty.,* 668 F.2d 869, 874 (6th Cir. 1982)).

Plaintiff has not introduced any evidence that creates a genuine issue of material fact as to whether Conway knowingly approved the KSP officers' hospital visit. Plaintiff's allegations do not suggest that Conway had any direct involvement in a decision to request that the KSP officers visit plaintiff in the hospital to speak with him about his online postings and email communications. Plaintiff specifically alleges that OAG supervisors Long and Bender were involved in the request to have KSP officers visit him the hospital after seeing his tweet, "It has to be done. There is no other alternative." (Doc. 169 at 2, Statement of Fact No. 4). Plaintiff also specifically alleges that Bender advised the officers of plaintiff's whereabouts after viewing a picture of plaintiff which he had posted on his Instagram account. (*Id.*, Statement of Fact No. 3). However, plaintiff does not allege any facts or proffer any evidence to implicate Conway in Long and Bender's decisions or actions. Nor has plaintiff proffered any evidence to show that Conway was involved in any communications initiated by the OAG regarding plaintiff's criminal proceeding or that Conway intervened in any manner in the criminal proceeding.

Thus, Conway cannot be held liable on plaintiff's First Amendment retaliation claim. Plaintiff has not introduced any evidence which, if credited, supports a finding that Conway knew of or was involved in a decision to request the assistance of the KSP officers or that Conway knew of the KSP officers' planned investigatory visit at the hospital. The evidence also does not support a finding that Conway retaliated against plaintiff by intervening in the state court criminal proceeding. Conway cannot be held liable under the doctrine of *respondeat superior* for the actions of other individuals in the OAG absent some evidence implicating him in those actions. Accordingly, Conway is entitled to summary judgment on plaintiff's First Amendment claim.

**b. First Amendment claim against the KSP officers**

The KSP officers contend they are entitled to qualified immunity on plaintiff's First Amendment retaliation claim. The Court agrees because (1) plaintiff's online posts and email communications are not protected speech under clearly-established case law, and (2) there is no evidence of a causal connection between protected speech by plaintiff and any adverse action by the KSP officers.

The evidence shows that plaintiff began sending emails to the OAG in February 2015 after he received an unfavorable decision on an Open Records Act appeal, 15-ORD-015. Plaintiff first sent an email to Harrison and to Conway at the email address "jack.conway@ky.gov" on February 5, 2015, accusing the OAG of racism in connection with the decision. (Doc. 167, Exh. B, p. 2). This email was not threatening or unprotected in and of itself. However, the communications Bonds sent over the ensuing seven months became increasingly hostile and troubling. After plaintiff sent several more hostile emails addressed to Harrison, Badaracco advised Bender on March 26, 2015 that he was keeping a file of plaintiff's correspondence. Badaracco opined at that point that only a "very weak" argument could be made that plaintiff's correspondence violated Kentucky statutes against harassment or harassing communications. (Doc. 165, Exh. I).

Plaintiff sent at least 10 more emails to OAG personnel between March and September 1, 2015, in which he accused them of racism and angrily demanded a face-to-face meeting with Conway. (Doc. 167, Exh. B, pp. 17-41). Bonds attached a photo of a lynching to one email (Doc. 167, Exh. B, pp. 3-5) and a photo that allegedly showed a Spencer County, Kentucky high school student in "black face" makeup to another email. (Doc. 167, Exh. B, pp. 29-33). Bonds' emails about the Open Records Act decisions against him culminated in an email he sent to

several OAG employees on August 31, 2015, in which he accused them of allowing Shelby County to steal from him and issued what could reasonably be construed as an implied threat of violence directed at the OAG:

> A Negro male from another state once stole from me. Once. His new street handle is 'Hamburger Helper'. . . .
> . . . .
>
> Oh yeah, fuck you Michelle Harrison and Robyn Bender. Please do the citizens of the Commonwealth a favor and eat shit and die. You too Benjamin for giving out fake email addresses. You call a grown woman in a professional setting, Shelly? And fuck John Will 'Jack' Conway too.

(Doc. 167, Exh. B, pp. 39-40).

In the meantime, plaintiff sent a series of tweets beginning in July 2015 that the OAG could reasonably construe as directed at them. These included his tweet of a photo of a gun on July 1, 2015 that read: "Look what came in the mail today. It's all black. You can be a white supremacist, but watch how you say all that." (Doc. 167, Exh. D, p. 2). Bonds had referred to OAG personnel as white supremacists and their actions as "blocking for white supremacy" in emails he sent to the OAG around this same time, including emails he sent on July 27, 2015, August 12, 2015, and August 31, 2015. (Doc. 167, Exh. B, pp. 25-27, 38, 39-40). Further, Long documented that he terminated his conversation with Bonds in July 2015 after Bonds stated that 15-ORD-015 was worse than "Charleston," which Long understood to be the mass murder by white supremacist Dylann Roof. (Doc. 167, Exh. B, p. 22; Exh. C, Long Aff., ¶ 7). When Bonds' "white supremacist" tweet and photo of a gun is considered in the context of plaintiff's hostile email communications and comments using the same terminology to describe the OAG, the tweets could reasonably be construed as threatening messages directed toward the OAG. *See Watts,* 394 U.S. at 706-08 (speech must be considered in the context of the circumstances). Speech of this nature is not protected under the First Amendment, even if the speaker did not

actually intend to carry out a threat he conveyed. Rather, intimidation is a type of "true threat" which is not protected by the First Amendment. *Black,* 538 U.S. at 359-360. *See also Baumgartner v. Eppinger,* No. 1:10cv2810, 2013 WL 5563913, at *15-16 (N.D. Ohio Sept. 27, 2013) ("threats that intimidate or cause fear or apprehension by the recipient are unprotected by the First Amendment," and the plaintiff's internet posting of a modified version of a rap song that referenced victim's wife by name and his family constituted a true threat).

It is clear from the evidence that the OAG felt intimidated by Bonds' communications and internet posts, which was an objectively reasonable reaction in light of the circumstances. In response to plaintiff's communications, the OAG arranged to have security at the Capitol building intercept plaintiff before he came to their offices because of the safety concerns his communications had generated. (Doc. 167, Exh.C, Long Aff., ¶ 6). Although plaintiff described his meeting with Long at the Capitol building as professional and cordial, Long questioned immediately after his meeting with plaintiff at the Capitol Building whether he should have met with plaintiff alone (Doc. 167, Exh. B, p.22), and plaintiff made clear in an email he sent to the OAG shortly after the meeting that he was furious with the OAG and with the fact that he had been intercepted when he came to the Capitol building. (Doc. 167, Exh. B, pp. 23-24). The OAG subsequently took additional precautions in the face of the perceived safety threat plaintiff posed, including contacting Carroll. (Doc. 167, Exh. B, p. 39). Carroll informed Long on August 31 or September 1, 2015, that plaintiff fit the profile of an active shooter and the OAG acted on Carroll's recommendations that Harrison's parking spot should be moved closer to the Capitol building and increased security should be made available to the OAG. (Doc. 167, Exh. C, ¶ 11).

Thus, the undisputed evidence shows that Bonds made statements which, when viewed as a whole and in the context of all the surrounding circumstances, could reasonably be interpreted as a serious statement of intent to harm OAG personnel. Although plaintiff attributes innocuous meanings to his posts and communications, those meanings are not clear from the face of plaintiff's posts and emails. Nor did OAG personnel perceive plaintiff's communications to be harmless. Read together and in the context of the circumstances giving rise to the speech, plaintiff's repeated social media postings, website communications, tweets and email messages over a period of several months could "reasonably be interpreted as a serious expression of intent to harm [an individual]" that is not protected by the First Amendment. *Hankins*, 195 F. App'x at 301. Viewed from an objective perspective, plaintiff's speech constituted a "true threat" to the safety of employees in the OAG which is not entitled to First Amendment protection. Thus, the first element of a prima facie case of First Amendment retaliation is not satisfied.

To the extent there is any uncertainty under the law as to whether plaintiff's speech is protected by the First Amendment, the KSP officers are entitled to qualified immunity under the second prong of the qualified immunity inquiry: whether the law was clearly established when plaintiff's claim arose. *See Barker,* 649 F.3d at 433. The Court is unable to identify a Supreme Court decision or a decision issued by a court in the Sixth Circuit where speech similar to plaintiff's speech has been held to be protected by the First Amendment. *See White*, 137 S.Ct. at 552. Rather, the speech at issue in this case falls somewhere on the continuum between a direct threat of violence directed toward a specific individual, which has been found to be unprotected, and speech that constitutes an expression of political discontent which, though couched in terms of violence, has been held to be too vague to fall outside the parameters of the First Amendment. Because plaintiff's right to engage in the speech in question was not clearly established as of the

date of the incidents giving rise to this lawsuit, the KSP officers are entitled to qualified immunity from liability on the claim.

Even if plaintiff were able to satisfy the first element of a prima facie case of First Amendment retaliation by showing he engaged in protected conduct, the Court finds as a matter of law that plaintiff has not produced evidence to satisfy the second element of his claim. Plaintiff alleges the KSP officers intimidated him, they searched his room by looking under his bed sheet, and Caudill warned plaintiff to "handle this, or else," which plaintiff interpreted to mean things would "end badly" for him if he did not leave Conley and the OAG alone. (Doc. 164 at 8-10). Plaintiff alleges that he took Caudill's statement to be a threat to his "livelihood and safety" and he shut down his website as a result. However, plaintiff has not produced evidence which, if credited, supports his allegations. Plaintiff has not submitted a supporting affidavit, and his deposition testimony does not corroborate the allegations he makes in his summary judgment filings.

Plaintiff testified at his deposition about everything the KSP officers said to him and did during the hospital visit. Plaintiff testified that the officers said they were there to talk to him about "some stuff you have been posting on social media about Mr. Jack Conway and members of the Attorney General Office." (Doc. 161, Plaintiff's Depo., p. 143). Plaintiff testified that Caudill told him, "You know, we just want to make sure you handle this the right way." (*Id.* at 145). Plaintiff testified that he understood Caudill to mean "Knock it off or we're going to kill your black ass" because Caudill was talking with his hand "either near" his gun or "massaging his gun" at times. (*Id.* at 145, 147). Plaintiff said he responded by telling the officers, "I told them I was going to sue them. What more do you want?" (*Id.* at 145). Plaintiff testified that Caudill said something more as he was turning around that sounded like "or else," but whatever

Caudill said was only "moderately audible." (*Id*. at 151). Plaintiff testified that neither of the officers told him to take down his website, but plaintiff thought it was implicit in their statement, "Handle this the right way." (*Id*.). He also testified that neither officer explicitly told him to stop tweeting about Conway. (*Id*. at 151-52). Plaintiff testified that as Caudill was talking, Saint-Blancard briefly lifted up and looked under the hospital bedsheet around plaintiff's knee, saw there was one loose sneaker under the sheet, and then put the sheet back down, which plaintiff "found to be very intrusive." (*Id*. at 144, 152-53).

Plaintiff's deposition testimony is insufficient to support his claim that the KSP officers took an adverse action that would "chill or silence a person of ordinary firmness from future First Amendment activities." *Benison*, 765 F.3d at 659 (quoting *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 822). Although plaintiff described the officers' actions as intimidating and testified that they put him in fear for his life, he did not testify that the officers ever threatened him or told him he was required to stop posting online or tweeting. Plaintiff's deposition testimony supports a finding only that the officers told him they wanted to speak to him about his social media postings concerning Conway and members of the OAG and they wanted to make sure he handled these matters "the right way." (*Id*. at 145). Plaintiff testified at his deposition that Caudill added something that "sounded like 'or else'" at the end of this statement, but plaintiff is not sure this is what Caudill said because plaintiff stated his words were only "moderately audible" and Caudill did not say anything more until the officers were turning around to leave. (*Id*.).

Further, while plaintiff alleged that he was afraid the officers would kill him in his hospital bed, plaintiff has not articulated an objective, reasonable basis for this fear. Plaintiff does not allege that the officers threatened him with bodily harm. He does not allege that either officer reached for or pointed a gun at plaintiff and testified only equivocally that Caudill had

"his hand near his service weapon, if not massaging it at times." (*Id.*, p. 145). Plaintiff was not alone in the room with the officers. Rather, he testified there was an elderly patient with a visitor present in the room on the other side of a curtain that served as a partition, and Saint-Blancard states in his affidavit that hospital staff were nearby. (Doc. 166, Exh. 1, ¶ 7). Plaintiff does not allege that the officers coerced him in any manner. Plaintiff was not under arrest and the officers did not have a warrant, but plaintiff does not allege that he asked the officers to leave the room or that he verbally objected to their presence.

In addition, plaintiff did not stop his criticisms of Conway and the OAG following the visit as would be expected if the KSP officers had acted in a manner that actually put plaintiff in fear for his life. The evidence plaintiff has submitted belies his claim that he discontinued his online activities and his website because of the officers' visit. In a September 4, 2015 email to OAG personnel, Bonds wrote:

> Fuck each and every last one of you. You sent goons to see me in the hospital. That was
> Funny. Now you've got a federal lawsuit coming. Again, fuck you and every thing you stand for. Fuck Jack Conway. I'm voting for Bevin.

(Doc. 161, Exh. 31). On September 9, 2015, Bonds emailed the OAG with a link to his website, theoutclause.com. (Doc. 161, Exh. 37). On September 12, 2015, Bonds wrote in an email to the OAG:

> Please respond to the email address tbonds776@yahoo.com as my Web site will be undergoing its annual maintenance and over haul. I'm not sure when dude is going to get started tho. LOF.
>
> No phone calls as you all do me.
>
> But due to your recent behavior, my plan is to file this Monday, 9/14/15 at 2 p.m. unless we can reach an agreement prior to then.
> . . . .

As previously mentioned by Robyn Bender, I do not have an email address for Jack Conway. Emails from her prove that although he is a public employee, his email is not made available to the public.

(Doc. 161, Exh. 37). Bonds testified at his deposition that he did not renew the website because he did not want to continue with it, but he notified the OAG that the website would be undergoing its annual maintenance because he "wanted Jack Conway and his underlings to think that I was still giving them the--you know, the butt whipping on the Internet about their machinations." (Bonds Depo, 211:12-18; Doc. 167, Exh. E). While plaintiff need not show he was "actually chilled" by the alleged adverse action, his subsequent First Amendment activities contradict his allegations that defendants threatened him and placed him in fear for his life if he did not stop engaging in protected speech..

Plaintiff has not introduced any other evidence to show he suffered an injury of any consequence that could be attributed to the actions of the KSP officers. *See Wurzelbacher,* 675 F.3d at 584 (retaliation claim is properly dismissed as a matter of law if the alleged adverse action is "inconsequential," resulting in no more than a "de minimis injury"). Plaintiff has proffered a hospital record that purports to show his blood pressure spiked after the officers' visit, but there is no way to tie the 200/125 reading he alleges resulted from the officers' visit to their actions. (*See* Doc. 165, Exh. D). Plaintiff alleges he lost income because he took down his website in response to the KSP officers' alleged threats, but he has not introduced evidence to corroborate his allegations that (1) the officers threatened him, and (2) he took his website down for reasons related to the visit. In fact, plaintiff testified that he did not renew his website because he did not want to continue with it and the site was undergoing its annual maintenance.

Thus, the Court finds that plaintiff cannot establish the second element of his First Amendment retaliation claim against the KSP officers as a matter of law. The evidence does not

raise a genuine issue as to whether the officers' visit to the hospital, their questioning of plaintiff, their actions while at the hospital, and the brief search of plaintiff's hospital bed were "*capable of deterring a person of ordinary firmness from engaging in the protected conduct.*" *Hill*, 630 F.3d at 472-73) (emphasis in original). Plaintiff has not met his evidentiary burden "to establish the factual basis for his claim that the alleged retaliatory acts amounted to more than a de minimis injury." *Id.* at 473.

Further, even if plaintiff had produced evidence sufficient to establish the first two elements of his claim against the KSP officers, plaintiff cannot prove the causal connection element of his First Amendment retaliation claim against these defendants. Plaintiff alleges that the dispatch log shows a causal connection between his protected conduct and the KSP officers' hospital visit because the log documents the officers' purpose was to talk to plaintiff about his social media posts concerning the OAG and Conway. (Doc. 164 at 9-10, citing Exh. H). Plaintiff alleges that because he has carried his burden to show the three elements of a First Amendment retaliation claim are satisfied, defendants have the burden to show they would have taken the same action in the absence of his protected conduct, which they cannot do. (*Id.* at 15).

However, the evidence does not support a finding that the KSP officers acted with a retaliatory motive as necessary to satisfy the causal connection element. Plaintiff cannot carry his burden on the causal connection element simply by showing the reason for the officers' visit was his online speech about Conway and the OAG. Rather, plaintiff must satisfy a two-prong inquiry: (1) that "the adverse action was proximately caused by an individual defendant's acts"; and (2) "the individual taking those acts was motivated . . . by a desire to punish [plaintiff] for the exercise of a constitutional right." *See Paterek*, 801 F.3d at 646. The dispatch log is evidence that the KSP officers were dispatched to plaintiff's hospital room to speak with him

because of his online postings about Conway and the OAG so as to satisfy the first prong of the inquiry. (*See* Doc. 164, Exh. H). However, the log shows only that the officers were acting at the request of third parties as part of their law enforcement duties by responding to a dispatch. The dispatch log sheds no light on whether the officers acted with a retaliatory motive, and plaintiff has not introduced any other evidence that raises an issue as to whether the KSP officers acted with a retaliatory motive.

Thus, plaintiff's evidence does not satisfy his burden on summary judgment as to his First Amendment claim against the KSP Officers. Defendants Saint-Blancard and Caudill are entitled to qualified immunity from liability on plaintiff's First Amendment retaliation claim.

## c. Fourth Amendment claim against the KSP officers

Plaintiff alleges that the KSP officers violated his Fourth Amendment rights when they entered the Critical Care Unit of the hospital without a warrant to talk to him and searched under the hospital sheets only to find a shoe on his bed. Plaintiff alleges the officers were outside their jurisdiction during the hospital visit, and Saint-Blancard admittedly searched plaintiff's hospital bed in the absence of exigent circumstances. (Doc.165 at 9-12, 15; Exh. J, Defendants' Responses to Requests for Production Nos. 1, 6). Plaintiff alleges he had a reasonable expectation of privacy in his semi-private hospital room. (*Id*. at 10-11). Plaintiff challenges the KSP officers' credibility based on alleged inconsistencies in the evidence as to whether they spoke with an officer believed to be associated with the Cincinnati Police Department at the hospital before visiting plaintiff, whether defendants secretly recorded the encounter, and whether dispatch and arrival times for the encounter entered on the dispatch log are correct. (Doc. 176 at 18-19, citing Exh. B; Doc. 165 at 15-16, citing Exh. J, Interrogatory Answers No. 8, 9, 10, 11, 12, Request for Admission No. 8; Doc. 165, Exhs. L, M). Finally, plaintiff contends

that defendants cannot show they are entitled to qualified immunity on his Fourth Amendment claim. (Doc. 176 at 16-17). Plaintiff argues that defendants knew his conduct was protected because they unsuccessfully tried to obtain a warrant against him, and Saint-Blancard knew there was no legal right to search plaintiff's room.

Defendants argue that the search of plaintiff's hospital bed involved a brief lifting of the bed sheet at the foot of plaintiff's bed in a shared hospital room to identify the object in the bed, which did not violate a reasonable expectation of privacy. (Doc. 166 at 12, citing *United States v. Transou*, 572 F. Supp. 295 (M.D. Tenn. 1983); *Dow Chemical Co. v. United States,* 749 F.2d 307, 312 (1984)). They also argue that the alleged search was objectively reasonable in light of "(1) the scope of the intrusion; (2) the manner in which the search was conducted; (3) the justification for the search; and (4) where the search was conducted." (*Id.* at 13, citing *Jennings v. Fuller*, 659 F.App'x 867, 869 (6th Cir. 2016); *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Defendants argue they are entitled to qualified immunity on plaintiff's Fourth Amendment claim because the "contours of the right to be free from a search in one's hospital room are not clearly defined," and the law in this Circuit is not clear as to whether plaintiff had a reasonable expectation of privacy in his hospital room. (Doc. 166 at 16, citing *Dixon v. HHS*, No. 17-11841, 2017 WL 3457100, *12 (E.D. Mich. Aug. 11, 2017) (citing *New v. United States*, 652 F.3d 949 (8th Cir. July 18, 2007) (citing state-court decisions and noting a "split of authority on the question whether a patient has a reasonable expectation of privacy in a hospital room.")).

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. Amend. IV. The Fourth Amendment protects an individual from an unreasonable search and seizure only where he can show that: "1) he manifested a subjective expectation of privacy in the object of the challenged search," and 2) "society is prepared to recognize that expectation

as legitimate." *United States v. Berryhill,* 352 F.3d 315, 316 (6th Cir. 2003) (citing *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1510 (6th Cir. 1988) (citing *California v. Ciraolo,* 476 U.S. 207, 211 (1986)). The determination of whether a search is reasonable requires a twofold inquiry: (1) whether the "action was justified at its inception"; and (2) "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *New Jersey v. T.L.O.,* 469 U.S. 325, 341 (1985) (quoting *Terry v. Ohio,* 392 U.S. 1, 20 (1968)).

The KSP officers are entitled to qualified immunity on plaintiff's Fourth Amendment claim. The threshold issue - whether plaintiff had a reasonable expectation of privacy in the hospital room he shared with another patient - is an unsettled question of law in this Circuit. *See, e.g., Dixon*, No. 17-11841, 2017 WL 3457100, at *4. Neither party has directed the Court to case law from the Sixth Circuit or a federal district court that indicates the Sixth Circuit has addressed the issue. Thus, defendants were not required under clearly established law to obtain a warrant in order to enter the room and question plaintiff.

While the questioning was justified in scope at its inception, there is a separate question as to whether Saint-Blancard's brief search under the sheet at the foot of plaintiff's bed was "reasonably related in scope to the circumstances which justified the interference in the first place." *O'Connor*, 480 U.S. at 726. Plaintiff's right to be free from a search of this nature was not clearly established such that a reasonable officer in defendant's position would have known he was violating plaintiff's rights by conducting the search. *Plumhoff*, 134 S.Ct. at 2023. The intrusion was very limited in scope as it was momentary and limited to the lower portion of the bed, it was conducted in a hospital setting rather than in plaintiff's home, and the apparent purpose of the search was a protective one to identify the object under the bed sheet.

Thus, plaintiff's Fourth Amendment right to be free from questioning and the brief search conducted by the KSP officers was not clearly established on the date of the hospital visit. The KSP officers are entitled to qualified immunity from liability on plaintiff's Fourth Amendment claim.

### D. State law claims

Plaintiff alleges violations of provisions of various Kentucky statutes in his summary judgment filings. Defendants contend that plaintiff did not allege in the amended complaint certain state law claims he now seeks to bring, and the KSP officers are entitled to immunity under state law.

Plaintiff did not assert any claims under state law in the amended complaint. (Doc. 72). Plaintiff cannot raise claims for violations of state law for the first time in his motion for summary judgment and in response to defendants' motions for summary judgment. The Court therefore will not address any alleged violations of state law.

## IT IS THEREFORE ORDERED THAT:

1) Plaintiff's motion for summary judgment against defendant Conway (Doc. 164) is **DENIED**.

2) Plaintiff's motion for summary judgment against defendants Caudill and Saint-Blancard (Doc. 165) is **DENIED**.

(3) Defendant Caudill and Saint-Blancard's motion for summary judgment (Doc. 166) is **GRANTED**.

(4) Defendant Conway's motion for summary judgment (Doc. 167) is **GRANTED**.

Date: __5/1/18__

Karen L. Litkovitz
United States Magistrate Judge